JOHN E. TUSANT et al., Appellees, v. GRAND LODGE ANCIENT
ORDER OF UNITED WORKMEN et al., Appellants.

**INSURANCE:** Mutual Benefit Insurance—Validity of Fundamental
1 Change in Insurance. A statutory fraternal mutual benefit asso-
ciation possesses no power, subsequent to its organization, in-
corporation, and receipt of members, to fundamentally change
the nature of its insurance, without the consent of members ad-
versely affected, by arbitrarily dividing its membership into dis-
tinct classes, and compelling each class to separately meet its
own death losses by discriminatory rates applied in utter dis-
regard of the long-maintained membership of members.   -

PRINCIPLE APPLIED: An unincorporated fraternal bene-
ficiary insurance association met its death losses, for many
years, by monthly assessments of $1 on each member, irrespec-
tive of age. It then abandoned this rate, and adopted a *change-
able* rate: i. e., so long as a member was 18 and under 25 years
of age, he paid $1.30 as monthly assessment on a $2,000 certifi-
cate. When he became 25 years of age, he paid $1.45 until he
became 29 years of age, and so on, with advancing rates, through
several age classifications, until he became 50 years of age,
when he paid $3.85 thereafter. No objection was made to this
change. There was never any limitation upon the number of
assessments which might be made. In 1911, the association was
incorporated, under Section 1822 *et seq.*, Code, 1897. Prior to
this, the managing officers claimed that the outstanding poli-
cies would ultimately be so large that they could not possibly
be paid, *under the rates then in force.* This condition was
ascribed to the old members over 50 years of age, as they were
practically the only ones dying, and claim was made that *their*
assessments did not pay *their* death losses. To avoid this con-
dition, the association enacted by-laws, and started on the plan
of putting its existing membership, composed of aged members,
in a class by themselves, to be known as Class A, and its accru-
ing and future membership in a class by itself, to be known as
Class B, *and compelling each class to bear its own death losses.*

Class B was put on an *unchangeable* level premium rate, de-
terminable by the member's age *at time of joining.* This rate,
for $1,000 insurance, ranged from $1.30 per assessment, for a
member 18 years of age, to $10.64 for one 70 years of age or
over. Members in Class A were at first given the privilege of

dropping their old insurance and joining Class B. So doing, for a member 70 years of age, would increase *each* assessment, on a $2,000 policy, from $3.85 to $21.28, or, on 10 assessments a year, from $38.50 to $212.80. A new member *might* join Class A, but strong and successful influence was exerted to induce him not to do so. A year later, Class A was wholly closed to new members, thereby preventing further accession of members to that class.

Under the above plan, Class A continued to pay the old changeable rate, which had a maximum of $3.85 for a $2,000 policy, *and death losses in Class A were charged against that class alone, and those of Class B were charged against it alone.* Class A was not able to raise sufficient funds to meet *its* losses, and an existing reserve fund was drawn on, with increased insolvency. Class B prospered, paid all its losses from 10 assessments per year, and built up a large reserve.

In 1916, the Grand Lodge adopted a new by-law, under which the members of Class A were peremptorily ordered to join Class B. This, in its last analysis, meant that Class A members should rejoin the association, as of their *then* age. In so joining, they were given two alternatives: (a) to pay under the Class B rates, according to their *then* age, *regardless of their long-maintained membership and insurance,* or (b) to continue paying at their old rate (the maximum of which was $3.85), but submit to a scaling of the face of the policy, commensurate with such rate. Expulsion was the penalty for failure to embrace one of the alternatives. To take the first option and pay under Class B rates would increase some assessments from 350 to 450 per cent; to continue their old rate, but submit to such scaling, would, for a member 70 years of age, reduce a $2,000 policy to $366. This procedure effected three intended results as to Class A: (1) Many old members lapsed their insurance; (2) many of the younger members did join Class B; and (3) Class A, with 7,000 members in 1916, soon dwindled to 115 members.

*Held,* the said by-laws of 1911 and subsequent thereto, the fictitious creation of said so-called Classes A and B, and the procedure thereunder by which Class A was denied the benefit of new membership, and consequently the benefit of existence, and the application of said rates to the members of Class A, in utter disregard of their long-maintained membership and insurance, were *legally unreasonable,* and therefore void.

**INSURANCE:** Action on Policy—Non-Attached Applications. Applications or representations of an assured, which, by the terms

of the policy, are made a part thereof, or referred to therein, or which may in any manner affect the validity of the policy, are, under Section 1741, Code, 1897, non-provable to defeat an action on a *fraternal beneficiary certificate of insurance*, unless attached to the certificate by true copy, even though Section 1826 of said Code, enacted some years *subsequent* to Section 1741, and dealing with beneficiary associations alone, covers the same subject-matter, though less comprehensively than said Section 1741.

**STATUTES:    Construction—Subsequent Enactment on Same Subject-3    Matter.**    Principle recognized that a subsequently enacted statute does not *necessarily* supersede a prior and still existing and more comprehensive statute on the same subject-matter.

**INSURANCE:    Mutual Benefit Insurance—Limitation on Rates.**
4    Whether a statutory fraternal beneficiary association has power, *by advance contract*, to limit assessments to an amount less than is reasonably necessary to pay death losses, etc., *quaere.*

**INSURANCE:    Mutual Benefit Insurance—Power to Apply Level 5    Premium Rates.**    Whether a statutory fraternal beneficiary insurance association has power to adopt a table of level premium rates which are sufficient not only to pay all current death losses, but to create a *reserve* fund which will be sufficient to mature all certificates many years hence, regardless of the future acquisition of any new members, *quaere.*

**APPEAL AND ERROR:    Review, Scope of—Decree Beyond Plead-6    ings.**    Issues not tendered by the pleadings, and which do not necessarily inhere in the controversy, will, in an equity case, on appeal and trial *de novo*, be excluded from the adjudication.

*Appeal from Polk District Court.*—W. S. AYRES, Judge.

MAY 14, 1917.

REHEARING DENIED APRIL 4, 1918.

SUIT in equity by the plaintiffs as members of the defendant association, asking to enjoin the enforcement against them of certain by-laws and amendments purporting to have been adopted by the defendant association, whereby the rights of the plaintiffs, as certificate holders of life insurance, will be greatly depreciated in value. There was a de-

cree for the plaintiffs, and the defendants have appealed.—
*Modified and affirmed.*

*E. B. Evans* and *H. F. Zeuch,* for appellants.

*Miller & Wallingford* and *Roy E. Curray,* for appellees.

EVANS, J.,—The defendant is a fraternal beneficiary association, organized under the provisions of Sections 1822 and 1823 of the Code. It was originally organized about fifty years ago, as a voluntary association,

1. INSURANCE: mutual benefit insurance: validity of fundamental change in insurance.

and was formally incorporated in 1911, as a voluntary association not for profit. It is essentially a life association, which purports to pay its death losses by appropriate assessments upon the surviving members. Its maximum insurance is $2,000, for which it issues its certificate to a member. For many years, and up to the year 1901, monthly assessments of one dollar upon every member were made, for the purpose of paying death losses. In 1901, a change was made, which appears to have been generally acquiesced in. This change increased and classified the rates of assessment so as to impose a somewhat heavier rate upon the older men than upon the younger. A minimum rate of $1.30 and a maximum rate of $3.85 per assessment were adopted. The maximum rate applied to men fifty years of age and over. Monthly assessments at this rate were thereafter made. In 1911, certain changes were made, which greatly affected the plan of insurance theretofore in force, and this change was further intensified by certain actions had in 1916. The controversy centers upon these latter changes, and these will be dealt with more in detail. The plaintiffs are four members of the defendant order who have been such for many years, and have brought this suit in their own behalf as certificate holders, and in behalf of other members similarly situated. Up to a time shortly prior to the bringing of this suit, the defendant order had a membership in Iowa of about 15,000.

Since that time, its membership has been somewhat reduced, and its life may be at stake in this proceeding. Leading up to the action of which complaint is made, it may be said, first, that the officials of the defendant order claim that, for many years, they had collected from their members less than the cost of their insurance; that the company had been organized in a haphazard sort of way, without any reference to mortality tables; that the computation of actuaries showed it to be in fact insolvent, in the sense that its certificates or policies were ultimately greater in sum total than could possibly be realized by the collection of assessments at the rate-then in force; that the older members of the order were furnishing practically all the mortality, and were, therefore, a liability, rather than an asset; that the assessments collected from members over fifty years of age were not sufficient to pay the death losses of members above such age; that, if these older members could be eliminated, or could be required as a separate class to pay a rate which would of itself pay the death losses in their ranks, then the order would become automatically solvent, in the actuarial sense. The separation of these older members as a class from the remaining body of the order became the objective of the officials, and their acts to that end are the occasion of this controversy. By methods to be further stated, the older members were put into a separate class, and were required to pay the death losses of such class, the great body of the younger membership being wholly exempted from any liability for such death losses. The result of such classification was to increase the rates of assessment of this class to a prohibitive degree, being an increase of 350 to 450 per cent. The class into which the older men were gathered is known in this record as Division A. This class now contains 115 members. The 115 members are assessed at a rate fixed by the computations of an actuary, which will be sufficient to pay the earlier death losses as they occur, and to build up a re-

serve sufficient to pay the beneficiary of the last man to suc-
cumb. By this plan, the problem of insolvency has been ren-
dered exceedingly simple. If the older members *pay* the rates
of assessment imposed, solvency will thereby be accomplish-
ed. If they *fail to pay,* they must lapse, and thereby solvency
will be likewise accomplished. In other words, the alleged
insolvency of the order was gathered into this one place,
and was charged up to these older members, on the theory
that they were responsible for it. But they were allowed
the generous option of taking it or letting it alone. It was
enough that the body of the younger membership was whol-
ly exempted from its obligations. The method adopted
for bringing about this result impresses us as somewhat orig-
inal. In 1911, a by-law was adopted, creating a new class
into which future membership would be received. The class
is known in the record as Division B. The following rate of
assessment per $1,000 was provided for such new class.

| Age | Rate | Age | Rate |
|---|---|---|---|
| 18 | $1.00 | 35 | 1.68 |
| 19 | 1.03 | 36 | 1.74 |
| 20 | 1.05 | 37 | 1.81 |
| 21 | 1.08 | 38 | 1.88 |
| 22 | 1.10 | 39 | 1.95 |
| 23 | 1.13 | 40 | 2.03 |
| 24 | 1.17 | 41 | 2.12 |
| 25 | 1.21 | 42 | 2.21 |
| 26 | 1.24 | 43 | 2.31 |
| 27 | 1.28 | 44 | 2.41 |
| 28 | 1.32 | 45 | $2.52 |
| 29 | 1.37 | 46 | 2.63 |
| 30 | 1.41 | 47 | 2.75 |
| 31 | 1.45 | 48 | 2.89 |
| 32 | 1.50 | 49 | 3.04 |
| 33 | 1.55 | 50 | 3.20 |
| 34 | 1.62 | 51 | 3.36 |

| | | | |
|---|---|---|---|
| ·52 . . . . . . . . . . . . . . . . . | 3.54 | 62 . . . . . . . . . . . . . . . . . | 6.43 |
| 53 . . . . . . . . . . . . . . . . . | 3.73 | 63 . . . . . . . . . . . . . . . . . | 6.85 |
| 54 . . . . . . . . . . . . . . . . . | 3.94 | 64 . . . . . . . . . . . . . . . . . | 7.30 |
| 55 . . . . . . . . . . . . . . . . . | 4.20 | 65 . . . . . . . . . . . . . . . . . | 7.94 |
| 56 . . . . . . . . . . . . . . . . . | 4.39 | 66 . . . . . . . . . . . . . . . . . | 8.29 |
| 57 . . . . . . . . . . . . . . . . . | 4.66 | 67 . . . . . . . . . . . . . . . . . | 8.82 |
| 58 . . . . . . . . . . . . . . . . . | 4.95 | 68 . . . . . . . . . . . . . . . . . | 9.31 |
| 59 . . . . . . . . . . . . . . . . . | 5.29 | 69 . . . . . . . . . . . . . . . . . | 10.00 |
| 60 . . . . . . . . . . . . . . . . . | 5.64 | 70 . . . . . . . . . . . . . . . . . | 10.64 |
| 61 . . . . . . . . . . . . . . . . . | 6.02 | Over 70, at 70. | |

The existing membership was thereafter known as Division A, and continued to pay assessments according to the rates established in 1901, which were as follows:

| Class.    Ages. | Assessment Rates | |
|---|---|---|
| | $ 1000 | $2000 |
| 1—18 to 24 years inclusive . . . . . . . . . . . $ | .65 | $1.30 |
| 2—25 to 29 years inclusive . . . . . . . . . . . . | .75 | 1.45 |
| 3—30 to 34 years inclusive . . . . . . . . . . . . | .80 | 1.65 |
| 4—35 to 39 years inclusive . . . . . . . . . . . . | .95 | 1.90 |
| 5—40 to 44 years inclusive . . . . . . . . . . . . | 1.15 | 2.25 |
| 6—45 to 49 years inclusive . . . . . . . . . . . . | 1.45 | 2.90 |
| 7—50 years and over . . . . . . . . . . . . . . . . | 1.95 | 3.85 |

The table of rates adopted for the new class was what is known as "the level rate plan." The rate of assessment of a member was determined therein by the age attained by him at the time he became a member, and such rate would continue unchanged thereafter; whereas the rate of assessment for a member in Division A increased with advancing age, and was determined by the age of the member at the time of the assessment. Theoretically, at first, any proposed member had the option of joining either division. As a matter of fact, the officials favored Division B. They invited all new membership into such division. The division was also open to a transfer by the membership of Division A.

The table of level rates for Division B was naturally more · attractive to the younger members than to the older. In 1912, Division A was closed entirely to new membership, and new members were received only in Division B. This of itself not only throttled Division A, by the cutting off of its new membership, but it increased the pressure upon the younger members to transfer to Division B. And such was the result, as we have already indicated. By a system of blood transfusion, Division B took all the strong blood of the original association and absorbed all its solvency, and left it nothing but its former liabilities.

From 1911 to February, 1916, the officials of the order in effect operated two independent companies, side by side. The death losses in Division A were charged against that division alone, and those of Division B were charged against it alone. The 1901 table of assessment rates was applied to Division A, and the 1911 table was applied to Division B. The monthly assessments in Division A were not sufficient to pay all the death losses therein, so that the reserve was encroached upon, and the insolvency of the division increased. In Division B, only ten monthly assessments were made each year, and the amount thereof paid all death losses and built up a reserve fund of more than $350,000. In February, 1916, further amendments were adopted at a special session of the Grand Lodge, which were intended to end pretense, and to heal the dripping wound by removing the seat thereof. By these amendments, the members of Division A were peremptorily required to transfer to Division B. Upon such transfer, they were given the option of two courses:

(1) They could maintain their insurance, by paying the Division B rate, which we have above set forth; or

(2) They could continue to pay their assessments according to the 1901 table of rates of Division A, and submit to a scaling of their certificates down to an amount com-

mensurate with such date of assessment, as shown by the mortality tables of the actuaries.

The table of scaling thus presented as an alternative was as follows:

| Age | Rate $1.00 | Rate $1.95 | Rate $2.95 | Rate $3.85 |
|---|---|---|---|---|
| 50 . . . . . . . . . . . . . | $305 | $610 | $915 | $1220 |
| 51 . . . . . . . . . . . . | 290 | 580 | 870 | 1160 |
| 52 . . . . . . . . . . . . | 275 | 551 | 826 | 1102 |
| 53 . . . . . . . . . . . . | 261 | 523 | 784 | 1046 |
| 54 . . . . . . . . . . . . | 247 | 495 | 742 | 990 |
| 55 . . . . . . . . . . . . | 232 | 464 | 696 | 928 |
| 56 . . . . . . . . . . . . | 222 | 444 | 666 | 888 |
| 57 . . . . . . . . . . . . | 209 | 418 | 627 | 836 |
| 58 . . . . . . . . . . . . | 197 | 394 | 591 | 788 |
| 59 . . . . . . . . . . . . | 185 | 369 | 554 | 738 |
| 60 . . . . . . . . . . . . | 173 | 346 | 519 | 692 |
| 61 . . . . . . . . . . . | 162 | 324 | 486 | 648 |
| 62 . . . . . . . . . . . . | 152 | 303 | 455 | 606 |
| 63 . . . . . . . . . . . . | 143 | 285 | 428 | 570 |
| 64 . . . . . . . . . . . . | 134 | 267 | 401 | 534 |
| 65 . . . . . . . . . . . . | 123 | 246 | 369 | 492 |
| 66 . . . . . . . . . . . . | 118 | 235 | 353 | 470 |
| 67 . . . . . . . . . . . . | 111 | 221 | 332 | 442 |
| 68 . . . . . . . . . . . . | 105 | 209 | 314 | 418 |
| 69 . . . . . . . . . . . . | 98 | 195 | 293 | 390 |
| 70 or over . . . . . . . . | 92 | 183 | 275 | 366 |

Under the first option, a member 70 years of age, though he had been such member for 40 years, would be required to pay, upon transferring to Division B, precisely the same rate as a new member of such age, namely, $10.64 per assessment for $1,000 insurance. For the holder of a $2,000 certificate this would be $21.28 per month. Under the second option, such member must consent to a scaling down of his certifi-

cate from $2,000 to $366. It will be seen, therefore, that the options presented to the members of Division A were not options, but alternatives. It mattered little to the member which way he faced; he was confronted with menace either way.

In the pioneer days of this state, there was extant a boy story of two hunters, Caucasian and Indian. In the division of game, the Caucasian said to the other: "I'll take the turkey and you take the buzzard; or if you would rather, *you* take the buzzard and *I'll* take the turkey." The Indian grunted his reply: "You never said turkey to me." This resembles the situation of the members of Division A as they see it. They see nothing but "buzzard" in either alternative.

At the time of the adoption of this last amendment, 7,000 members remained in Division A. The immediate result was that thousands of them lapsed, and other thousands of them submitted to the compulsion of a transfer; so that now, as already indicated, only 115 remain.

In order to accomplish this amendment, which was an amendment of the constitution, a two-thirds vote of the representatives at the special session was required. This was accomplished by counting only the votes representing Division B. The only questions litigated herein are those involving the rights of the 115 remaining members. Four of them are the plaintiffs herein. These have been members of the order, in good standing, for from 25 to 30 years. They challenge the legality of the purported amendments of 1911 and 1916; they challenge the power of the Grand Lodge to establish *two* so-called divisions to occupy the same field of insurance; they challenge its power to charge the mortality of the order against the older membership; they challenge its power to make an amendment so fundamental as to change the essential character of the order, by converting it from a mutual assessment company, paying death losses when they occur, to what, in practical effect, is

an old line investment company; they challenge the new
rate proposed as being unreasonable and inequitable, and
the proposed scaling of certificates as illegal.  These propo-
sitions are reducible to the one ultimate proposition: Were
the acts done and proposed by the order so beyond the
bounds of reasonableness, in a legal sense, that they should
be held ineffective?

I.  Preliminary to the ultimate question, a question of
evidence is presented.  On the trial below, the defendant of-
fered in evidence the respective applications of the plain-
tiffs when they applied for membership to
the order.  By these applications, the ap-
plicants agreed to be bound by future amend-
ments to the by-laws.  Plaintiffs' objec-
tion to this offer was sustained, on the ground that such
applications were not attached to the certificates, as re-
quired by Code Section 1741.  Appellant's first complaint
is directed to this ruling.  Its contention is that Section
1741 has no application, because of the provisions of Code
Section 1826.  These two sections are as follows:

2. INSURANCE:
action on pol-
icy: nonat-
tached appli-
cations.

"Section 1741.  All insurance companies or associations
shall, upon the issue or renewal of any policy, attach to
such policy, or indorse thereon, a true copy of any applica-
tion or representation of the assured which, by the terms of
such policy, are made a part thereof, or of the contract of
insurance, or referred to therein, or which may in any man-
ner affect the validity of such policy.  The omission so
to do shall not render the policy invalid, but if any com-
pany or association neglects to comply with the requirements
of this section it shall forever be precluded from pleading,
alleging or proving any such application or representations,
or any part thereof, or falsity thereof, or any parts there-
of, in any action upon such policy, and the plaintiff in any
such action shall not be required, in order to recover against
such company or association, either to plead or prove such

application or representation, but may do so at his option."

"Section 1826. All such associations shall, upon the issue or renewal of any beneficiary certificate, attach to such certificate or indorse thereon a true copy of any application or representation of the member which by the terms of such certificate are made a part thereof. The omission so to do shall not render the certificate invalid, but if any such association neglects to comply with the requirements of this section it shall not plead or prove the falsity of any such certificate or representation or any part thereof in any action upon such certificate, and the plaintiff in any such action, in order to recover against such association, shall not be required to either plead or prove such application or representation."

The original adoption of Section 1741 antedated the original adoption of Section 1826. The former was adopted in 1880, and is somewhat general in its application. The latter is a part of Chapter 9, and has special

3. STATUTES: construction: subsequent enactment on same subject matter.

reference to fraternal beneficiary associations. It will be observed that they are not identical in their provisions. If Section 1741 is applicable here, the ruling of the trial court was right. If it was not applicable, the ruling was wrong. The argument for appellant is that, because Section 1826 was adopted subsequently to Section 1741, and because it was made a part of the special chapter under which the defendant order was organized, it was intended to supersede the operation of Section 1741, so far as applicable to such an organization. As an original proposition, the argument is not without its force. But the question thus presented has heretofore received our consideration, and it is no longer open to debate. So far as the fact of subsequent adoption is concerned, both sections have been adopted simultaneously, by subsequent codification. The point now urged by appellant has been ruled adversely to it in the

following cases: *Grimes v. Northwestern Legion of Honor*, 97 Iowa 315; *Stork v. Supreme Lodge K. of P.*, 113 Iowa 724. See also *Corson v. Iowa Mut. Fire Ins. Assn.*, 115 Iowa 485; *McConnell v. Iowa Mutual Aid Assn.*, 79 Iowa 757. The ruling of the trial court was in accord with the foregoing.

II.  We come to the ultimate question whether the amendments promulgated by the Grand Lodge in 1911 and 1916 were, in a legal sense, unreasonable, and therefore ineffective.  In reaching a general conclusion upon this question, three particular features of these amendments stand out prominently.  They are:  (1) The separation of the membership of the order into two distinct divisions; (2) the alleged change of the fundamental nature of the insurance; (3) the discrimination made against the older members in the adoption of the 1911 table of rates, by refusing them recognition of their existing membership, and by applying the rate to them as of the age attained by them when they should transfer to Division B, instead of as of the age attained by them when they joined the order.

(1)   We think it was an abuse of power to divide the membership of the order into two divisions, upon the basis which was actually adopted.  There was no legitimate reason for such division.  The two divisions thus created occupied the same field of insurance, and were necessarily competitive and hostile.  No set of officials could consistently serve both of them.  To serve one was to neglect the other. The law is deep-written in the nature of things and in human nature that "no man can serve two masters,   *   *   * else he will hold to the one and despise the other." This law has had its exemplification in the history of these two divisions.  The amendment of 1911 purported to create Division B for the purpose of *new* members, the entire existing membership of the order being left as Division A.  This was pure indirection.  Though indirection it was, it had the paradox-

ical merit of frankness, and took no cover of concealment. Its purpose is frankly explained by the officials as an effort to put the order upon a solvent basis. They reasoned that, if they raised the rates upon the younger members, they might lose them, and the life of the order would thereby be threatened. If they raised the rates upon the older members, they might lose them also, but such a loss could be welcomed as a salvation of the order. It would be the equivalent of a discharge of its greatest liabilities. Such was the conceded purpose of the creation of Division B. If it were not conceded, such purpose would be no less plain. Division B, therefore, was a mere name. Division A was a mere name. The entity of the order was not affected. It was *one,* and not *two.* By the use of these names, it was intended both to extinguish and to keep alive the old order. As Division A, it was to die, and as Division B, it was to be born again. By the death of Division A, the old members would lose their membership. They would come into Division B only as new members coming into a new order. Their rates of assessment, therefore, would be determined by the age attained by them at such time, and not by the age attained by them when they joined the order originally. It should be borne in mind that these old members never joined *Division A.* That name was simply applied to them. They joined the defendant order, many, many years ago. They are still members of it. Does the order which the plaintiffs joined still live? Are they members of it? If members, are they old members or simply new ones? If we treat Divisions A and B as separate entities, or as distinct parts of defendant's entity, could *both* of them at any time have had a prospect of life? When the divisions were created, Division A was made to include the entire existing order. Has Division A been dying a natural death, or have its past officials been an aid to its demise? If they have

held to one division and despised the other, which have they despised?

(2)   Turning now to another phase of the discussion, much is said in the argument for the defendant as to the alleged insolvency of the defendant, and the necessity of adopting some means to save its existence.   We are by no means satisfied that the question of solvency or insolvency of the defendant order has much pertinency to the case, if, indeed, it can be said in any case that a strictly mutual assessment company is either solvent or insolvent.   This company existed originally as a purely voluntary association, without even the formality of incorporating.   It was formally incorporated in 1911, as already indicated.   It was purely a mutual assessment company, imposing and collecting assessments from its surviving members for the payment of death losses after they had occurred.   It gave no guarantees. It came into being nearly fifty years ago.   It has always paid its death losses.   The claim of insolvency is based upon the figures of the actuaries, from which it is deduced that, with the prospect of future mortality, it cannot continue forever to pay its death losses upon the rate of assessments obtaining prior to 1911.   Up to 1901, a uniform assessment of one dollar per month had been made upon all members, regardless of age.   In 1901, the differential rate was adopted which we have hereinbefore set forth, wherein a heavier rate was charged upon older members than upon the younger.   This rate has always been acquiesced in by the membership, and we assume its reasonableness, for the purpose of this discussion.   While the by-laws prior to 1911 fixed a *rate* of assessment, there never was any limitation in the by-laws as to the number of assessments which might be levied at such rate.   So far as the constitution and by-laws were concerned, the only limitation upon the number of assessments was determined by the number of deaths.   The power of the order, therefore, to make sufficient assessments to cov-

er the death losses, was ample under the by-laws. The difficulty with the exercise of this power was a practical one. It was that the making of assessments more frequently than once a month had a manifest tendency to materially reduce the membership of the order. The question involved in this litigation, therefore, is not so much the power of the order to make sufficient assessments to pay all death losses; it is, rather, whether the methods adopted by it are unreasonable, as being discriminatory, and therefore unfair. If the order had the power to make assessments sufficient to pay all losses, then surely it was not insolvent, unless it may be said that all assessment companies are in that sense insolvent, from their very inception. If the order was simply confronted with the practical difficulty of inducing its membership to submit to the necessary assessments to pay all losses, that was a contingency which inhered in the very nature and plan of the association. Mutual insurance has its own natural limitations. It is not the equivalent of what is usually known as "old line" insurance. It can give no guarantee. It has no assets, and is entitled to none. Whatever it collects belongs to some beneficiary of a death loss. It has the merit of cheapness and the demerit of uncertainty. It is something less than absolute insurance. Its cheapness is attractive, and the real value of it is often more than com mensurate with its cost. The defendant order is one of the time-honored orders of that kind. It has been a real boon to thousands, and ought to so continue for many years to come. We are told that, when it first came into being, it was simply an undertaking by approximately 2,000 persons that, while his membership continued, each would pay a dollar to the beneficiary of every death loss. Such an undertaking could hardly be called insurance, in the "old line" sense; but mutual insurance, nevertheless, it was. Was the association at that time solvent or insolvent? It had neither assets nor liabilities. Could it be said that these 2,000

men each had secured insurance upon his life, in the sense
for which defendant officials now contend? The first man
died, and the surviving 1,999 paid their dollars. This
proved to be insurance, at least for the first man. It later
proved to be substantial insurance for the second man. If
this membership were to remain stationary, surely the last
man could not hope for any benefits to his beneficiary. His
only hope would rest upon the continuing increase of the
association and the taking in of new members. Without
pursuing further the illustration, it is sufficient to say that
it is of the very essence of mutual insurance and of the effi-
ciency thereof that it shall grow, and that it shall continue
to receive new and younger blood. This is the only chance
for the two thousandth man. When growth sickens or dies,
mutual insurance depreciates accordingly. Continual
growth has been the life of the defendant order. No natural
reason appears in this record why it should not have so con-
tinued, if it had been heroic enough to face its liabilities
without subterfuge. That a member should live beyond the
natural expectancy of his life ought not to be deemed an of-
fense against an insurance company. It is argued by de-
fendant that it is costing more to carry the insurance on
these old men than they are paying in the way of premiums.
This argument is a deduction from another fact: that the
older men have furnished all the mortality of the order, and
that these men must, in the course of time, create similar
liabilities. Granting that these men must soon die, the
death loss will be no greater than if death had occurred
twenty years ago. If they are a loss to the company now,
they were not such twenty years ago. They have been pay-
ing members ever since, and have cost nothing, so far. The
fact that other men of their age have died is not more
chargeable to them than to any other member of the order.
That was the risk that all took. When these men joined the
order, it was with the professed purpose of continuing in it

to the end. Can it be said that a member who lives beyond
his expectancy is a greater loss to the company than the one
who died prematurely? When these men joined the order,
they joined themselves to a membership many of whom had
already reached their expectancy. These plaintiffs began
at once to pay death losses on such. When they paid such
losses, they had nothing to expect in return from those whose
membership had ceased by death. Their only way of com-
pensation was from those who should come after. They re-
lied, and had a right to rely, for the security of their insur-
ance upon the new blood which was to come. And yet we
find that, in 1912, the past officials of this order closed Divi-
sion A against all new membership. Was that an act of
life or of death? It not only closed the door to new mem-
bership, but it opened the door of exit from A into B for all
the younger membership of the order. Having thus sep-
arated the young from the old, it then said to the older men:

"You shall constitute a little company of your own.
You shall pay your own death losses. We shall assess you
sufficiently to pay such death losses and to accumulate a re-
serve sufficient to pay the loss of the last man. Be thou
faithful unto death, and we will give you a reward of life."

The net result is a little insurance company of 115 old
men, who exhibit staying qualities comparable to those of
some distinguished creatures in the animal world. This re-
sult has been brought about intentionally, though circuit-
ously. The creation of the divisions A and B had no other
function or purpose than to accomplish just this result. Is
it a fair observance of the obligation implied by this order
to its membership? Cheap insurance is a pressing induce-
ment to a young man. But what is cheap insurance worth,
even to a young man, if, after he has carried it all his life,
he may be walled off in old age with a few other old men,
and thereby separated from all the benefits of the growing
order? True, old age is a liability, but it is the very liabil-

ity against which youth insures. When such liability is about to mature, shall it be deemed an insolvency, and as such, shall it be gathered into a little pocket, as nature gathers her pus? Shall an old membership which has paid dues for thirty years be deemed the equivalent of a mere carbuncle, to be lanced and discharged for the saving of the life of the order?

We are not unmindful of the warning contained in the briefs that an affirmance of this case will take the life of the defendant. We would fain believe otherwise. If, however, such be the result, it will be not because of the conclusions herein, but because its life has already been taken. If it may by this process become rid of its liabilities by the overthrow of its old membership, it has made a great discovery. It may adopt the same course five years hence, and every four or five years thereafter. True, it promises otherwise henceforth, but new promises are no better than old ones. These plaintiffs had promises. Future plaintiffs will have nothing more. This course furnishes a sure door of escape from the very substance of insurance liability. It is the door of repudiation, and nothing less. What is the life of the order worth, if its insurance fails? When a human being makes the saving of his life the chief end of his existence, he has already lost it. "Whoso will save his life shall lose it." If the past officials of this order had directed their solicitude less to the saving of the life of the order, and more to the faithful performance of its obligations, the life of the order would probably have been secure. No reason is apparent in this record why it should not have prospered indefinitely. The life-saving proceedings which are herein considered form the greatest menace which it has ever confronted. If they shall prove fatal, it must be charged up as a life-saving fatality. If the order can be saved, its honor must be reasserted and redeemed. No insurance company can live in the dishonor of any form of repudiation.

(3)   Much of the contention of the defendant order is based upon the alleged inadequacy of rates paid by Division A.   This was the 1901 table, which we have hereinbefore set forth.   It is urged that the 1911 table adopted for Division B, which we have hereinbefore set forth, is a correct and scientific table, based upon the mortality experience.   We shall have no occasion in this discussion to find any fault with the 1911 table.   What has not been explained to us in the briefs is why the long-time membership of these plaintiffs in this order should be ignored in applying to them the 1911 rates.   As already explained, this table presents a level-rate plan, based upon the age attained by the member when he joins.   This is the advantage given to early joining.   For instance, the plaintiff Tusant joined this order at 28 years of age.   According to the 1911 table, a monthly assessment of $2.64, limited to ten assessments a year, would not only have paid every death loss occurring during his lifetime, but would create a reserve large enough to mature every outstanding certificate, regardless of any new membership.   Notwithstanding his long-time membership at all times in good standing, the only alternative that is now presented Tusant is to rejoin the order of which he has always been a member, and to assume a rate of assessment according to the age now attained by him.   In other words, he is put upon precisely the same basis as any new member of his present age would be put.   Take the case of Barlow, who is plaintiff in a companion case submitted herewith.   He was a paying member for more than 30 years.   The sum total of his assessments and dues paid amounted to $998.   He was expelled, for failure to accept either of the alternatives presented.   If, instead of becoming a member of the order in the first instance, he had proceeded to create a fund of his own, by successive payments equal to his assessments and dues, such fund, including accruing interest, would now amount to a sum approximately sufficient to purchase for him, at his age

of 74, a paid-up insurance policy for $2,000, upon the basis of the 1911 table. The expert for the defendant in his case testified that a paid-up policy on that basis would cost Barlow something over $1,500 present payment, and that the present value of payments to be made by him in accordance with the 1911 table would total, with accruing interest, something over $1,600. Yet Barlow is told by the officials of the defendant order that he has at all times been a charge upon the charity of the order, and that the cost of his insurance has largely been carried by other members.

Putting together the plan heretofore in operation and the new plan to be in operation hereafter, it would cost Barlow more than $3,000 to mature his $2,000 policy. Consistently enough, the experts of the defendant testified, in Barlow's case, that his present policy had *no* value, because the future payments necessary to mature it would, with interest, amount to its full face value. This furnishes a concrete illustration of the defendant's theory that old men who have outlived their expectancy have already cost the defendant order more than the value of their insurance. Such theory is manifestly unsound, and it devolves upon the order to find some other cause or source of its trouble. Barlow's membership has cost nothing, so far, to the defendant order, nor will it ever cost anything if his expulsion is to stand. He has paid out $998, for which, as yet, he himself has received nothing. True, the money so paid has been expended by the defendant order for the purposes for which it was paid. But the only possible consideration for Barlow was that similar expenditures would be made in behalf of his beneficiary at the maturity of his certificate. This consideration being repudiated, he has nothing. The rates tendered to him are precisely the same as they would be if he were joining as a new member. Surely, a correct theory of insurance ought to find some present value in a certificate fully maintained for 30 years, which had cost

$998. If this be so, then no new rate could well be reasonable if it ignored such fact. This is not saying that such certificate should be worth $998. It may well be conceded that the fact of existing insurance for 30 years had of itself a substantial value, in that the contingency of death would have matured the certificate at any moment. We think it quite clear, however, that, if this order was justified at all in changing the fundamental character of this insurance, and in adopting an old line standard and a level rate, then it should be such for all its membership, old as well as young. The essence of the level rate is that the age attained at the time of membership fixes the unchanging rate. We have held frequently that the right of an association to amend its by-laws does not carry the right to make material reduction in benefits promised, nor to materially increase the consideration, if fixed. We need not cite authorities to these propositions. None of our previous cases have a controlling bearing upon the case at bar. In view of the fact that there was no limitation upon the power of the order as to the sum total of assessments which it might collect, the amount of the particular assessment is not a controlling question, except as bearing upon the question of discrimination among members. The following authorities from other jurisdictions bear upon some of the important features of our case. *Ebert v. Mutual Reserve Fund Life Assn.,* 81 Minn. 116 (83 N. W. 506, 834, 84 N. W. 457) ; *Strauss v. Mutual Reserve Fund Life Assn.,* 126 N. C. 971 (36 S. E. 352) ; *Benjamin v. Mutual Reserve Fund Life Assn.,* 146 Cal. 34 (79 Pac. 517) ; *Williams v. Supreme Conclave Improved Order of Heptasophs,* (N. C.) 90 S. E. 888.

We quote from the *Ebert* case as follows:

"It is evident that the contract contemplated an unsteady and varying death fund from which to pay death claims, and that the amount of the assessments would vary

according to the number of deaths, the growth of the association in membership, and earning capacity of the reserve fund. It is also clear that the law of self-preservation applied, and if, at any time, in order to meet maturing claims, it should become necessary to levy a larger amount than that stipulated as the maximum rate of the table, the power so to do was inherent in the association, and the directors would have authority to pass suitable rules and regulations for that purpose. But it is equally clear that neither by the contract of insurance, in contemplation of the laws of New York, the constitution and by-laws, nor from the natural, inherent power of the association, based upon the doctrine of the general good, does there exist authority to arbitrarily determine in favor of one class of members and against another class."

We quote also from the *Ebert* case, as follows:

"The old members joined the association upon the theory that it was to be a living institution,—as old members drop out and are paid off, new ones come in, younger in years, thus adding strength, and keeping up the vitality of the association. The new members entered upon the same basis and with the same expectation, yet they continue to be assessed as of the age of entry on the 1889 table. There has been shown no reason for drawing an arbitrary line as of January 1, 1890. If the board of directors could advance the age of all members who joined prior to 1890, they can keep on setting out classes according to some certain year of entry, and advance its members, also as to age. And, if the board can advance the members who joined prior to 1890 to the current rates of the 1889 table, they can for the same reason advance them to years ahead of the current age. The board of directors had no authority to levy such an assessment as Call No. 96, and the act of the defendant in cancelling plaintiff's policy for nonpayment of the call made upon such basis was void."

We quote also from the *Benjamin* case, as follows:

"The essential principle upon which co-operative associations like that of the defendant is based is that there will be a constant invigoration of the association by the accession of new members; that it shall be in fact a going concern for the advantage of all; and that every member of the association will be given the benefit of the average mortality of the entire membership in force at the last death prior to an assessment, resulting from this constant addition of new members. And it was necessarily upon this theory that the earlier members of the association joined it. They anticipated the benefit which would result from a lower average mortality through the constant accession of these new members, and it was this benefit which was secured to Benjamin as one of the earliest members, by the provision in his contract which called for an assessment 'upon the entire membership in force at the date of the last death claim, the same to be apportioned among the members according to the age of each member.' He was entitled to this benefit which would accrue from the constant accession of such members. This accession would naturally create a lower average mortality among the entire membership, and consequently a smaller cost would have to be sustained by each member, where the assessment to meet death claims was distributed over the entire membership, equally apportioned as to amount according to the respective ages of the members."

Authorities are brought to our attention by the defendant holding contrary to the views herein expressed. Practically all of such decisions, however, are based either upon statutory provisions of the respective states or upon by-laws of the order, none which are applicable here.

(4) It must be recognized that, in the long run, the actual cost of carrying insurance must be paid in some way. The only way open to a mutual assessment association to

meet such cost is by assessment of its members. Sections 1822 and 1823 in effect require such an association to make provision for the payment of death losses by sufficient assessment. This implies authority in the association to increase rates in a fair and reasonable way, when reasonably necessary. This is certainly so in the absence of a contract limiting authority. Whether the association organized under the sections above cited has any power to limit by advance contract the assessment to an amount less than is reasonably necessary to comply with the mandates of such sections, we do not now determine. What is a reasonable rate in a given case must be determined in the light of generally recognized mortality tables and actuary computations. By Section 1839-j, Code Supplement, 1913, the legislature has promulgated a mortality table which is obligatory upon all associations organized subsequently to such enactment. It is not retroactive, and therefore is not obligatory upon the defendant association. Nevertheless, it may properly be considered on the question of reasonableness in the fixing of rates, as carrying some presumption in favor of its practical correctness. So far as appears in this record, the 1911 table of rates is consistent with such legislative mortality table. We do not denounce this 1911 table of rates, as such. It is not necessary for us now to hold that such table could or could not be applied to the existing membership, if done without unreasonable discrimination, and with recognition of the previous duration of such membership. The uncertain element at this point is whether the 1911 table is based upon a plan or form of insurance which, in its nature, is fundamentally different and more expensive than the merely mutual assessment insurance contemplated by Chapter 9 of Title IX of the Code. If yea, then, in order to be rea-

4. INSURANCE: mutual benefit insurance: limitation on rates.

5. INSURANCE: mutual benefit insurance: power to apply level premium rates.

sonable, the 1911 table should be scaled down to the requirements of cheaper insurance. We have already stated that this table contemplates not only the current payment of current death losses, but also the creation of a large reserve fund, which shall be sufficient to mature all certificates many years hence, regardless of the future acquisition of any new members. The soundness of such a plan of insurance is not questioned. But the question is whether it is not fundamentally different from the plan of mutual insurance contemplated by above Chapter 9. If it is, the defendant order had no power to adopt it, or to impose increased rates for its maintenance. If the mutual insurance contemplated by the statute may be carried with reasonable safety at a substantially less cost, both to the association and to the insured, without the creation of reserves, and in reliance upon the maintenance of the membership by the acquisition of new members sufficient to make up all losses of membership by death or lapse, then it may well be urged that the statutory plan must be adhered to. The question of reserve and the profitable use and safe care thereof presents a great problem of its own. Such a trust fund calls for statutory safeguards, both for its custody and for its proper and profitable utilization. In the absence of statutory safeguards, reserve funds have heretofore proved too often to be a treasure laid up "where moth and rust doth corrupt and where thieves break through and steal." No such safeguards are provided in the cited chapter. We do not find it now necessary to decide this question. Argument has been directed to it only incidentally, and we reserve decision thereon.

By way of recapitulation, what we do hold is: That the creation of Classes A and B was a mere fiction, and was ulterior in its purpose and unreasonable in its result; that the purported partition wall between such divisions must be ignored; that the entity of the defendant is one, and not

two; that the plaintiffs are members of the defendant order, and that the members of Class B are nothing else than members thereof; that the creation of such classes to occupy the same field of insurance and for the purposes indicated was inherently inconsistent with the organization of the defendant, and that, therefore, it was without power to create them; that the action of the order in purporting to deny to the plaintiffs, as Class A, the benefits of a going concern and of new membership was a violation of their substantial rights; that the same is to be said as to its refusal to recognize their continuing membership in the order; that, if a level rate is to be applied to the plaintiffs, it must take account of the date of their membership; that, whatever the rates applied to *new* members, such difference of rate afforded no justification for the separation of the *new* members into an independent or separate class, to be exempt from the ordinary liabilities of the order; that, as members of the defendant order, the members of the so-called Class B necessarily became liable for the ordinary liabilities of the order for death losses; that such *new* members could not be organized into a separate class or association within the defendant order and be permitted thereby to appropriate the livery and life of the defendant as a going concern and yet be exempt from its obligations,—the performance of which furnished the only reason for the organization and existence of the defendant order.

One other question remains. The defendant order had accumulated a fund known as the emergency fund. This amounted to about $120,000. The general plan that had been adopted was to apportion this fund in a way to equalize certain inequalities in the table of rates. For instance, the 1901 table of rates was based upon what is called the step-rate plan. A classification of seven classes was adopted. The same rate was applied to each member of a

6. APPEAL AND
   ERROR: review,
   scope of de-
   cree beyond
   pleadings.

class, regardless of the difference in age, there being a range of difference of from 4 to 6 years. Class 7 included all persons 50 years old or over. Assuming the rate of assessment for Class 7 to be a proper rate for a man 50 years of age, it necessarily became deficient as a rate for a man of 70. The emergency fund was applied to this deficiency, and ultimately to the benefit of the older men. The new members becoming such after 1911 had no part in the creation of this fund. It was at all times thereafter treated as belonging to Division A, as representing the existing membership antedating 1911. The plaintiffs, for themselves and for the 115 members of Division A now claim the exclusive right to this fund. Because certain of the older members who would have been entitled to share in this fund transferred to Division B, under the alternatives presented to them, the trial court apportioned this fund, and awarded about $71,000 thereof to be set aside to the benefit of such old members who have so transferred to Division B. Both parties complain of this action of the court, and both appeal from it. The plaintiffs contend that the entire fund should have been awarded to them, without any apportionment. The defendant contends that the court should have made no order whatever on the subject, because the pleadings raised no issue pertaining thereto. For the plaintiffs it is contended also that there was no competent evidence before the court to sustain the apportionment made. The only evidence we find in the record to sustain the apportionment is certain telegrams to and from the actuary, which were put in evidence over the objections of the plaintiff. The defendant does not defend the competency of this evidence. It is also true that there is nothing in the pleadings that tenders or raises any issue concerning this fund, unless it can be said that the question of its apportionment necessarily inhered in the controversy. If there ought to be an apportionment of this fund, the state of the record is not such as to enable us to determine as to what would be

a proper apportionment. In view of the conclusion which we have reached, that the pretended creation of classes was ineffective, and that all the members of the order are members of the same order and the same class, the question of apportionment would seem to be rendered quite immaterial. The entire fund still belongs to the defendant order. The question of apportionment will be reserved from the adjudication. To the extent herein indicated, the decree of the trial court will be modified. In all other respects, it is affirmed.—*Modified and affirmed.*

All the justices concur.