**COMMERCIAL INS. CO. OF NEWARK
v. BURNQUIST.
Civ. 514.**

United States District Court
N. D. Iowa, Central Division.
June 30, 1952.

922

Wayne G. Cook, Walter A. Newport, Jr., of Cook Blair & Balluff, Davenport, Iowa, for plaintiff.

Denis M. Kelleher, Fort Dodge, Iowa, for defendant.

GRAVEN, District Judge.

The plaintiff is a New Jersey insurance corporation. The name of the plaintiff was formerly "Commercial Casualty Insurance Company." The defendant is an individual, a citizen of the State of Iowa, and a resident of Fort Dodge, Iowa. The defendant is a lawyer. He was and is a member of the law firm of Burnquist, Helsell, and Burnquist, a well known and long established law firm of Fort Dodge, Iowa. He is a member of the Iowa State Bar Association, and has been a member of the Iowa State Bar Association at all times material hereto.

On May 9th, 1950, the Iowa State Bar Association, by its President, W. F. Riley, made application to the plaintiff for a policy of group disability insurance, which application was as follows (italics supplied):

"Commercial Casualty Insurance Company
Newark, New Jersey

"Application is hereby made to the Commercial Casualty Insurance Company for a policy of Group Disability Insurance on members based on the following statements and representations.

"1. Association *Iowa State Bar Association*
 Address *1101 Fleming Building,*
 City *Des Moines 9* State *Iowa.*
 Nature of Business *An Association of Attorneys.*

"2. It is our desire that the policy shall be made effective at 12:00 o'clock noon Standard time ————————————19——.

"3. Total number of members ————. No group or class of members is to be excluded, except members over 69 years of age, and members retired or who have ceased to be actively engaged in the Legal Profession.

"4. Number of members eligible: ——————————
 (*To be eligible for insurance hereunder, members must be on active full time duty on the date such insurance is to become effective.*)

"5. * * *

"6. * * *

"7. The premiums for insurance under this policy are due on the ———— day of ——————.

"8. The Association's contribution is $1.00 annually for each member.
 Date *May 9, 1950* Association *Iowa State Bar Association*
 Agent *Max L. Holmes Agency* By *W. F. Riley,* Pres.
 Des Moines, Iowa Official Position
 R. T. Moore Insurance Agency
 Cedar Rapids, Iowa"

The date "October 1, 1950," was subsequently inserted by typewriter in paragraphs 2 and 7 of such application.

On or prior to August 11th, 1950, the defendant filled out and mailed to the plaintiff a card which read as follows (italics supplied):

"Commercial Casualty Insurance Company
Enrollment Group Disability Insurance

"Name of Organization *The Iowa State Bar Association*
"Full Name *Wm. S. Burnquist*
"Mail Address *State Bank Bldg.* City *Fort Dodge* State *Iowa*
"Judicial District Number *Eleventh*
"Date of Membership in The Iowa State Bar Association *over 5 yrs.*
"Birth Date? Mo. *February* Day *10* Year *1913*
"Beneficiary *Marion M. Burnquist* Relationship *wife*
"*It is hereby understood and agreed that unless the applicant whose signature is appended hereto is on active full time duty on the effective date of the certificate, the insurance hereby applied for shall not become effective until the applicant resumes active full time duty.*
"Date *8/11/50* Signature *Wm. S. Burnquist*"

On Monday, September 11th, 1950, the defendant entered a hospital in Chicago, Illinois. During the first part of that week he underwent a physical examination at that hospital. It was determined at that time that the defendant had a condition of incipient pulmonary tuberculosis. The defendant spent the latter part of that week at work in his law office. On Monday, September 18th, 1950, the defendant entered a hospital at Rochester, Minnesota. During the first part of that week he underwent a physical examination at that hospital. His condition was again diagnosed as incipient pulmonary tuberculosis. The defendant spent the latter part of that week at work in his law office. On September 25th, 1950, the defendant entered the Veterans' Hospital at Des Moines, Iowa. He was a bed patient in that hospital from September 25th, 1950, to October 23d, 1950. On October 23d, 1950, the defendant was taken to the Iowa State Sanatorium at Oakdale, Iowa. He was confined in that Sanatorium as a patient until October 11th, 1951, except for two brief periods in January, 1951, when he was a patient in the State University of Iowa Hospital at Iowa City, Iowa, for the purpose of undergoing surgery.

During the period that the defendant was in the Veterans' Hospital at Des Moines, Iowa, he consulted with other members of his law firm relative to the work which the defendant had been doing, for the purpose of preparing such other members to take over the work of the defendant during his hospital confinement. Some clients also consulted him professionally during this time. The defendant remained a member of his law firm throughout his hospital confinement. The defendant at all times intended to return to the full time practice of his profession and has since so returned.

In September, 1950, it was determined by the plaintiff that the necessary number of individual applications for insurance under the Iowa State Bar Association group disability insurance policy applied for by such Association on May 9th, 1950, had been obtained, and that such group disability insurance policy would go into effect on October 1st, 1950. The "master policy," (Group Disability Policy No. GZ 1001)

was signed by the plaintiff and was delivered to the Iowa State Bar Association at Des Moines, Iowa, shortly prior to October 1st, 1950, to be effective as of October 1st, 1950. The application of the Iowa State Bar Association for such policy was attached to the master policy.

On the first page of the master policy it was stated (italics supplied):

"Eligibility, Effective Date And Renewal Agreement

"Eligibility Requirements. All active members of the Association, under sixty-nine years of age shall be eligible for insurance hereunder. (See Part XII, Page 4, captioned 'Eligibility Requirements.')

"Effective Date Of Master Policy shall be *October 1, 1950* and it may be renewed annually thereafter.

"Individual Renewals. The Company reserves the right to decline to renew the insurance of any Insured Member on the following grounds only:

a. Upon his failure to pay any premium when due; or

b. When the insured becomes seventy years of age; or

c. When he retires or ceases to be actively engaged in the legal profession; or

d. When he ceases to be an active member of the Association.

"Considerations

"*This policy is issued in consideration of the application of the Association and individual applications, if any,* and the payment of the initial premium and the further payment of renewal premium.

"The Provisions set forth on this and the following pages are hereby made a part of this policy.

"In Witness Whereof, the Commercial Casualty Insurance Company, Newark, New Jersey, has caused this policy to be signed by its President and Secretary and countersigned by a duly authorized representative of the Company.

"This policy is countersigned at Des Moines Iowa on October 1, 1950"

Part XI of the master policy provided as follows:

"Incontestable Provision

"(a) The insurance, for those Members who applied during the initial enrollment period and those new Members who are not required to submit evidence of insurability and whose statements contained in their application were considered as informative only, as shown in paragraphs (a) and (b) of Part XII, shall be incontestable as to the time of origin of sickness which causes loss after the effective date of his or her certificate.

"(b) * * *."

Part XII of the master policy provided as follows:

"Eligibility Requirements

"(a) Eligible Members applying for insurance prior to the effective date of the Master Policy or within the initial enrollment period shall not be required to submit evidence of insurability and the statements contained in their application shall be considered as informative only. * * *

"(b) For a period of 40 days following each third anniversary of the effective date of the Master Policy, eligible members may apply for insurance without evidence of insurability and the statements contained in their application shall be considered as informative only.

"(c) Subsequent to the effective date of the Master Policy and to the termination of the initial enrollment period, Members eligible and applying for insurance may be added to the group originally insured but the Company may require such applicants to submit evidence of insurability and shall be subject to the acceptance of the Company. * * *"

The master policy contained a list of 15 "Standard Provisions." Standard Provisions 1 and 2 provided as follows (italics supplied):

"1. *This policy includes the endorsements and attached papers, if any, and contains the entire contract of insurance.* * * *

"2. No statement made by the applicant for insurance not included herein shall avoid the policy or be used in any legal proceeding hereunder. * * *"

The master policy contained a list of 8 "Miscellaneous Provisions and Conditions." Miscellaneous Provisions 1, 5, and 6 provided as follows (italics supplied):

"1. The Company will issue to each Insured Member, a certificate containing a statement of the conditions and limitations of this policy and the insurance protection to which the Insured Member is entitled and to whom it is payable.

"5. *This policy, the application of the Association and the individual applications of the Insured Members constitute the entire contract between the parties.*

"6. All statements made by the Association or by any of the Insured Members shall, in the absence of fraud, be deemed representations and not warranties and no such statement shall be used in defense of a claim hereunder unless it is contained in the written application."

A "certificate of insurance" was issued by the plaintiff to the defendant and was received by the defendant on or about September 30th, 1950. A copy of the enrollment card previously filled out by the defendant was attached to the certificate. On the first page of such certificate appears the following:

"Certificate of Insurance

"Commercial Casualty Insurance Company

Newark, New Jersey

A Stock Company (Hereinafter called the Company)

"Having issued Group Disability Policy No. GZ 1001, insuring Members of

The Iowa State Bar Association

(Herein called the Association or Society)

Hereby Certifies that the Member ·to whom this certificate is issued (herein called the Insured Member) is insured under and subject to all conditions and limitations of said Group Disability Policy, from 12 o'clock noon, standard time at the place where the Insured Member resides, for loss resulting from injury or caused by sickness, in the. manner and to the extent therein provided."

There follows a statement of the provisions of the master policy. Part. XIII of the certificate makes the same statement as to individual renewals as appears on the first page of the master policy, heretofore set out.

Premium notices were mailed to members of the Iowa State Bar Association along with their certificates of insurance. A check in the amount of $43.50, dated September 30th, 1950, was sent from the defendant's office to the Max L. Holmes Agency, of Des Moines, Iowa, in payment of the initial semi-annual premium on the policy of the defendant. The Max L. Holmes Agency was the agency employed by the plaintiff to administer the group disability policy issued to the Iowa State Bar Association, and was authorized to collect premiums from insured members.

On November 22d, 1950, Mr. William R. Prouty, Jr., of the Max L. Holmes Agency wrote a letter to Mr. Bert B. Burnquist, the defendant's father and law partner, material portions of which were as follows:

"It has come to our attention that your son, William Burnquist, has been ill and is not practicing law at the present time. You perhaps may know that your son enrolled for the Group Accident and· Health Policy through the Iowa State Bar Association and it is our thought that he might be entitled to disability payment and hospitalization; therefore, we wanted to bring your attention to this as a claim should be filed as soon as possible."·

On November 24th, 1950, Bert B. Burnquist wrote an answering letter to William R. Prouty, Jr., material portions of which were as follows:

"My son and partner, William S. Burnquist, is now at Oakdale Sanatorium, Oakdale, Iowa, having been diagnosed as having tuberculosis. The first suspicion that anything of that kind existed was when he went to the Illinois Central Hospital ·Clinic in Chicago, for a physical examination on September 11, 1950. He was advised that he had tuberculosis. Neither he nor I believed it and on September 18, 1950, he went to Mayo Clinic at Rochester, Minnesota, where the same diagnosis was confirmed. On September 25, 1950, he went to the Veteran's Hospital at Des Moines, where it was again confirmed and he has been a bed patient ever since. On October 23, 1950, he was transferred to Oakdale Sanatorium, where he now is and will probably be for months to come.

"He undoubtedly is entitled to the benefit payments, which, I understand, commence as of October 1st. He was actively engaged as a partner in my firm. at the time and is, of course, still ·connected with the. firm but unable to perform his duties, other than correspondence and once a week conference with some member of the firm. If you have any blank forms to use, please send them to me and not bother him with ·the details. As you know, the best treatment for tuberculosis is to be kept free from any worries."

On November 27th, 1950, William R. Prouty, Jr., wrote an answering letter to Bert B. Burnquist, material portions of which were as follows:

"We are quite concerned about the conditions of your son's illness, under the provisions of the Iowa Bar policy. As you may know, this is a Group policy which was to be effective on October 1st for the members of the Iowa Bar Association who had enrolled previous to that time. However, under the application of enrollment it stated 'It is hereby understood and agreed that unless the applicant whose signature is appended hereto is on active full time duty on the effective date of this Certificate, the insurance hereby

applied for shall not become effective until the applicant resumes full time duty'. Your letter advises that your son was admitted to the Veteran's hospital in Des Moines on September 25th and that he has been a bed patient ever since. Under the terms of the enrollment, he would have to be in active full time practice on October 1st when the policy became effective.

"We are today writing to the Commercial Casualty Insurance Company presenting your case to them for consideration and we will contact you again within the next few days as soon as we have some word from the Company."

On December 18th, 1950, William R. Prouty, Jr., wrote a letter to Bert B. Burnquist, material portions of which were as follows:

"I have a letter from the Commercial Casualty Company in Chicago, Illinois regarding your son's illness. The facts concerning your son's disability outlined in your letter of November 24th have definitely excluded your son from any benefits under the Iowa State Bar policy. Let me say, here, that it is most regrettable to ourselves and to the Company that the conditions surrounding your son's disability do not permit a payment under his policy. * * *

"In my letter to you of November 27th I quoted the clause on the application blank which your son filled out. As I told you on the telephone this clause was included on the enrollment card for the reason that during the period of enrollment the Company did not know what date the enrollment would be completed and the policy would become effective. Therefore it was not reasonable for the Company to assume liability for a disability which had occurred and was continuing at the time of the inception date of the policy. The interpretation of the phrase of 'active full time duty' would be the usual daily office duties of an attorney. From your letter it appears that your son was hospitalized on the date that this policy became effective and has

been ever since. According to the terms of the enrollment as soon as your son returns to active full time practice his insurance then becomes effective and under the Iowa State Bar policy if he should have a recurrence of this disability after his insurance becomes effective that recurrence would be covered in full by this policy."

On December 20th, 1950, Bert B. Burnquist wrote an answering letter to William R. Prouty, Jr., material portions of which were as follows:

"Your letter announcing the refusal of the company to pay the benefits on William S. Burnquist's policy, came as quite a surprise to me. I cannot understand how the company can interpret the contract as they are apparently trying to do. From the beginning of the solicitation for membership until this claim is made, the representation of both your firm and the company and State Bar Association, has been that physical condition or ailments of the member of the bar association shall not, in any wise, prevent the enforcement of the policy when insured. The only reasonable interpretation, in view of the terms of the policy, of the language in the application is that the member applying for policy must be engaged in the practice of law, not whether he is able to practice. No good can probably come of an argument by letter, but I do wish to call your attention to the fact that William S. Burnquist is actively engaged in the practice as he is a one-fourth member in this partnership and is participating in the profits of the firm.

"Please advise by return mail as to whether or not the refusal of the company to pay the benefits shall be considered as a waiver of formal proof of loss. If not, please send proofs, so that we may protect William's rights by suit or otherwise.

"It is rather interesting also to note that in your application for membership for myself which I received in the same mail as your refusal to pay my son, you state further that on October

1, you made a payment for virus pneumonia to some policy holder and other payments in October."

On December 27th, 1950, William R. Prouty, Jr., wrote an answering letter to Bert B. Burnquist, material portions of which were as follows:

"I had forwarded your letter to the Commercial Casualty Company in Chicago. As you probably know, we are only Agents for the Company and are not the final word on a settlement. Therefore, I have asked the Commercial Casualty Company to give consideration to your letter and to either contact you directly from Chicago or give us further information to pass along to you.

"With regard to your paragraph about the payment for Virus pneumonia on October 1st and other payments which were made to various lawyers during October, the statement in the Iowa State Bar bulletin saying that a payment had been made on October 1st was a little erroneous in that the particular lawyer was on active full time duty on October 1st and this disability occurred after that date. It is true, however, that many of the claims which have been paid and are being paid result from conditions which were in effect prior to October 1, however, the actual disabilities have occurred since October 1st and the lawyers involved were able to be at their office in active practice on October 1st or even later than that date. I can say to you that no claim has been paid where the lawyer was disabled prior to October 1st and continued to be disabled on that date."

On January 2d, 1951, Mr. H. K. Bollan, Secretary of the Western Department of the plaintiff insurance company, located in Chicago, Illinois, wrote a letter to Bert B. Burnquist, material portions of which were as follows:

"The Group Insurance Policy issued to the Iowa State Bar Association under which a Certificate of Insurance was issued to your son William S. Burn-

quist, became effective on October 1, 1950.

"* * * [In the next several paragraphs certain provisions of the master policy and of William S. Burnquist's enrollment card were set out].

"It was never the intent of the company to pay for disabilities suffered prior to the effective date of the policy and a great deal of care and study was given by the company in an effort to so word the application as to make our meaning in that respect crystal clear through the provision in the application to the effect that the applicant must be on active full-time duty on the effective date of the Certificate—otherwise the insurance would not become effective until the applicant did resume active full-time duty.

"If your son were on active full-time duty upon the effective date of the Certificate, October 1, 1950, he would be entitled to benefits under the policy. However, if our understanding of the facts is correct, he was confined as a bed patient in the Veteran's Hospital at Des Moines on that date and has not resumed active full-time duty as a lawyer and thus the insurance, under the specific provision in the application, has not become effective.

"We sincerely hope that your son may speedily recover his health and return to active full-time duty, whereupon his insurance, if retained as an original enrollee, will become effective."

The plaintiff cashed and retained the proceeds of the check in the amount of $43.50 dated September 30th, 1950, which, as heretofore noted, was sent by defendant's office in payment of his initial semi-annual premium. On March 7th, 1951, a check in the amount of $86.00 was sent by the defendant's office to the Max L. Holmes Agency in payment of the semi-annual premiums on the policies of the defendant and of another member of his firm. This check was cashed by the plaintiff and the proceeds thereof were retained by it. A premium notice was sent by the plaintiff to the defendant prior to September 27th,

1951, requesting the payment of a semiannual or an annual premium for the purpose. of

"Continuing in force
Policy Number
GZ 1001."

The defendant sent a check dated September 27th, 1951, to the plaintiff in the amount of $42.50 in payment of a semi-annual premium. Apparently the Max L. Holmes Agency was in some doubt as to whether to accept such check and wrote to the Chicago office of the plaintiff for instructions. Apparently in response to such request for instructions, a Mr. C. S. Warner, Adjuster for the Western Department of the plaintiff, wrote the following letter to William R. Prouty, Jr., of the Max L. Holmes Agency:

"Mr. W. R. Prouty, Jr.
Max L. Holmes Agency
Hubbell Building
Des Moines 9, Iowa
 October 8, 1951
 "C50 G 20463
 Policy GZ 1001
 Iowa State Bar Association
 Wm. S. Burnquist
 Fort Dodge, Iowa

"Dear Sir:

"We have your letter of October 2.

"We suggest you accept the premium which you have received from the insured.
 "Yours very truly,
 "C. S. Warner, Adjuster."

Following such letter the check was cashed by the plaintiff, the proceeds thereof were retained by it, and a receipt therefor was sent to the defendant. The defendant never has requesed that any of the aforesaid premium payments be refunded to him, and none of them have been refunded to him.

On February 21st, 1951, the defendant submitted a "Notice and Proof of Loss" to the plaintiff in the amount of $785 with respect to coverage under Parts V (Hospital Indemnity), VI (Miscellaneous Hospital Expense), and VII (Surgical Operation Indemnity), of the Iowa State Bar Association group disability policy. On November

12th, 1951, the defendant submitted a "Notice and Proof of Loss" to the plaintiff in the amount of $2535.71, with respect to coverage under Part IV of such policy, relating to "Sickness Indemnity for Total Loss of Time." In such notice he made claim for loss of time from October 23d, 1950, through October 11th, 1951. Under the provisions of the group policy indemnities provided in the policy were payable after the expiration of 40 days after receipt of due proof.

On December 24th, 1951, the plaintiff filed in this Court its complaint for declaratory relief, requesting the Court to construe the policy of insurance issued by it and to declare that the insurance was not effective as to the defendant prior to October 11th, 1951, and that the defendant's claims for disability, hospital, and other benefits are not valid.

It is the contention of the plaintiff that by the terms of the Iowa State Bar Association group disability policy, such policy did not become effective as to the defendant on October 1st, 1950, because the defendant, being then hospitalized, was not on "active full time duty." It is the contention of the plaintiff that such policy was not effective as to the defendant prior to his release from the hospital on October 11th, 1951. It is the claim of the defendant, first, that he was on "active full time duty" on October 1st, 1950; second, that the effectiveness of the policy as to him was not conditioned on his being on "active full time duty" on October 1st, 1950; and third, that the plaintiff, by accepting checks tendered in payment of his insurance premiums during the time of his hospital confinement with knowledge of all the facts, waived any right which it may have had to refuse payment of his claims, and is estopped to deny that he has been covered at all times since October 1st, 1950. With respect to this latter claim of the defendant, it is the contention of the plaintiff that its acceptance of such premiums did not constitute a waiver on its part or work an estoppel against it, because the plaintiff was obligated to accept such premiums when tendered because of the defendant's right under the policy to remain a member of the enrolled group and to have his insurance

become effective as soon as he resumed active full time duty.

The plaintiff in its amended complaint admitted that the sums set forth by the defendant in his proofs of loss are correct, and consented that if the Court should find that the defendant was covered by insurance issued by the plaintiff, the Court should enter judgment in favor of the defendant in the total amount of such claims, to wit, $3,320.71.

There is no claim of fraud, concealment, or other improper conduct on the part of either party. Each party fully and correctly stated the pertinent and material facts to the other and both acted in good faith.

■ The first issue is as to whether the defendant was on active full time duty on October 1st, 1950, the effective date of the group policy. It appears without dispute that from September 25th, 1950, to October 23d, 1950, he was a bed patient in the Veterans' Hospital at Des Moines, Iowa. During that period he conferred from time to time with his partners in regard to their taking over legal matters he had been handling and occasionally he conferred with a client. On October 23d, 1950, he entered Oakdale Sanatorium at Oakdale, Iowa, also known as the Iowa State Sanatorium. He continued as a patient at that Sanatorium until October 11th, 1951. It appears that during the period he was hospitalized his firm continued to pay him his usual percentage of the earnings of the firm. It seems clear that a lawyer who is a bed patient in a hospital conferring only occasionally with the members of his firm and less frequently with clients cannot be regarded as being on "active full time duty." The situation is not changed by the fact that the firm of which he is a member continues to pay him his usual percentage of the firm earnings. The Court holds as a matter of law that the defendant was not on "active full time duty" on October 1st, 1950. The defendant calls attention to the fact that October 1st, 1950, was a Sunday. The Court is of the view that such fact is without significance. If because of such fact the effective date of the group policy be regarded as being October 2d, 1950, the situation of the defendant on that date so far as "active full time duty"

is concerned was the same as it was on October 1st, 1950.

The defendant not having been on active full time duty on the effective date of the group policy, the next matter to be considered has to do with the claims of the parties as to the legal effect of that situation. The plaintiff contends that its legal effect was to exclude the defendant from coverage until he returned to active full time duty. In this connection it is the claim of the defendant that under the pertinent statutory and case law he was not so excluded. This contention requires consideration of the Iowa statutory provisions relating to group insurance.

Group life insurance was first authorized in Iowa in 1919, under Chapter 197 of the Laws of the 38th General Assembly. This Chapter was Chapter 399 of the Codes of 1924, 1927, and 1931. In 1933 Chapter 399 was repealed and a chapter providing for group health and accident insurance in addition to group life insurance was passed. See Chapter 144 of the Laws of the 45th General Assembly. The new chapter appeared as Chapter 399-E1 of the 1935 Code, as Chapter 399.1 of the 1939 Code, and as Chapter 509 of the 1946 Code. In 1947 the old Chapter was repealed and a revised Chapter was substituted for it. See Chapter 256, Laws of the 52d General Assembly. In 1949, by Chapter 216, Laws of the 53d General Assembly, the Chapter was amended so as to authorize group life, accident and health insurance for "A lawyers' association to insure its members." See Iowa Code 1950, § 509.1(2)(c), I.C.A. The group health and accident policy in question in the present case was issued to the Iowa State Bar Association under the authority of Chapter 509, as amended.

■ It is the contention of the plaintiff that the condition limiting coverage to those enrolled members who were on active full time duty on the effective date of the group policy (which condition is stated on the enrollment card heretofore set out) is part of the contract and binding on the defendant because such card was attached to the certificate which was mailed out to the defendant. The defendant denies this contention and contends that the certificate

which was mailed to him is not part of the contract of insurance. Section 509.3, Iowa Code 1950, I.C.A., provides as follows:

"All policies of group accident or health insurance or combination thereof issued in this state shall contain in substance the following provisions:

"1. The policy shall have a provision that a copy of the application, if any, of the policyholder shall be attached to the policy when issued, that all statements made by the policyholder or by the persons insured shall be deemed representations and not warranties, and that no statement made by any person insured shall be used in any contest unless a copy of the instrument containing the statement is or has been furnished to such person.

"2. A provision that the company will issue to the policyholder for delivery to each person insured under such policy an individual certificate setting forth a statement as to the insurance protection to which he is entitled, to whom the insurance benefits are payable, and such provisions of the policy as are, in the opinion of the Commissioner of Insurance, necessary to inform the holder thereof as to his rights under the policy.

"3. A provision that to the group or class thereof originally insured shall be added, from time to time, all new persons eligible to insurance in such group or class."

The "policyholder" in the present case, as the term is used in the quoted section, is the Iowa State Bar Association. See Iowa Code 1950, § 509.1(2), I.C.A. It is to be noted that subsection 2 of the quoted section merely requires that the certificate set forth a statement as to the insurance protection which the insured person has under the policy. Miscellaneous Provision 1 of the master policy, heretofore set out, provides that the certificate should contain statements of the conditions and limitations of the policy and the insurance protection under it. Neither Miscellaneous Provision 5 nor Standard Provision 1, supra, purports, in terms, to make the cer-

tificate issued to the member part of the contract. The certificate itself does not purport to be part of the contract. It merely certifies that the member to whom it was issued is insured under and subject to the conditions and limitations of the group policy, and then sets out the provisions of the master policy. It would thus seem that the certificate which was sent by the plaintiff to the defendant was not made part of the contract of insurance between them, but is merely a statement of the provisions of such contract. The master policy rather than the certificate sent to the insured member is generally held to be the contract of insurance. See, e. g., Boseman v. Connecticut General Life Ins. Co., 1937, 301 U.S. 196, 203, 57 S.Ct. 686, 81 L.Ed. 1036; Collier v. Metropolitan Life Ins. Co., D.C. D.C. 1949, 82 F.Supp. 529; Thull v. Equitable Life Assur. Soc., 1931, 40 Ohio App. 486, 178 N.E. 850; Seavers v. Metropolitan Life Ins. Co., 1928, 132 Misc. 719, 230 N.Y. S. 366; 29 Am.Jur., Insurance § 1372; Annotations, 55 A.L.R. 1245, 63 A.L.R. 1034, 85 A.L.R. 1461. In John Hancock Mutual Life Ins. Co. v. Dorman, 9 Cir., 1939, 108 F.2d 220 a certificate which contained several provisions not in the master policy was held to be part of the insurance contract. The Court stated, 108 F.2d at page 222:

"A certificate required to be issued by the master policy to determine the terms and conditions of the insurer's liability is a part of the policy."

However, it was held in the case of Collier v. Metropolitan Life Ins. Co., supra, that where the certificate contains nothing which does not appear in the master policy, (except the names of the insured and the beneficiary) the rule of the Dorman case is not applicable and the certificate is not a part of the contract of insurance. A specimen printed form of the certificate issued by the plaintiff to the members of the group was introduced into evidence in the present case. It contains nothing which does not appear in the master policy. The certificate which was sent to the defendant is not part of the contract of insurance. This conclusion renders it unnecessary to consider the questions raised by the defendant as to the legal effect of Sections 515.94

and 515.95, Iowa Code 1950, I.C.A. on the matter of whether the certificate is part of the contract of insurance.

The real controversy between the parties is not as to provisions contained in the certificate, as such, but as to the status of the enrollment card (set out supra), a copy of which was attached to the certificate prior to delivery. The plaintiff furnished a printed form of enrollment card to those desiring to enroll for insurance under the group health and accident policy to be issued to the Iowa State Bar Association. The same form was used in all cases. It has sometimes been referred to as an application. As heretofore noted, the following provision appears on the enrollment card:

"It is hereby understood and agreed that unless the applicant whose signature is appended hereto is on active full time duty on the effective date of the certificate, the insurance hereby applied for shall not become effective until the applicant resumes active full time duty."

That provision is not contained in the master policy nor in the body of the certificate which was sent by the plaintiff to the defendant. A considerable portion of the written and oral argument was devoted to the discussion of whether, under those circumstances, the condition referred to in the enrollment card was operative so as to exclude the defendant from coverage.

The determination that the certificate is not part of the insurance contract does not necessarily dispose of the plaintiff's claim that the policy was subject to the condition that the insurance could not become effective unless and until the applicant was on active full time duty. The mere fact that a copy of the enrollment card which was signed by the defendant and which contained the statement of such condition was attached to the certificate when it was mailed to the defendant does not mean that the enrollment card cannot have significance apart from being a portion of the certificate. It is the claim of the plaintiff that the enrollment card was an application for insurance under the

group policy and that the defendant, having signed such card knowing of the condition stated thereon, is bound by such condition. The defendant apparently contends that because a copy of the enrollment card was not attached to the master policy the plaintiff cannot avoid liability under the policy because of a condition stated on the enrollment card. The defendant bases this contention upon Sections 515.94 and 515.95, Iowa Code 1950, I.C.A., which apply to insurance other than life insurance, and which provide as follows:

"515.94. All insurance companies or associations shall, upon the issue or renewal of any policy, attach to such policy, or indorse thereon, a true copy of any application or representation of the assured which, by the terms of such policy, is made a part thereof, or of the contract of insurance, or referred to therein, or which may in any manner affect the validity of such policy."

"515.95. The omission so to do shall not render the policy invalid, but if any company or association neglects to comply with the requirements of section 515.94 it shall forever be precluded from pleading, alleging, or proving any such application or representations, or any part thereof, or falsity thereof, or any parts thereof, in any action upon such policy, and the plaintiff in any such action shall not be required, in order to recover against such company or association, either to plead or prove such application or representation, but may do so at his option."

Similar provisions as to life insurance appear in Iowa Code 1950, §§ 511.33 and 511.34, I.C.A., and as to fraternal insurance in §§ 512.14 and 512.15. These statutes have been construed very strictly by the Iowa Supreme Court and by federal courts applying Iowa law to mean that an insurance company cannot rely defensively on the falsity of a statement in an application or on a condition set out in an application unless the signed application or an exact copy is attached to the policy, or on non-payment of a premium note unless the note or an exact copy is attached to the policy. See, e. g., Nolte v. Security

Ins. Co., 1929, 208 Iowa 716, 224 N.W. 50; Kennedy v. Metropolitan Life Ins. Co., 1922, 193 Iowa 5, 186 N.W. 625; Lyons v. Farm, Property Mutual Insurance Association, 1920, 188 Iowa 506, 176 N.W. 291; Tusant v. Grand Lodge A. O. U. W., 1917, 183 Iowa 489, 163 N.W. 690, L.R.A. 1918F, 452; Stillman v. Aetna Life Ins. Co., D.C.Iowa 1917, 240 F. 462; Robey v. State Ins. Co., 1910, 146 Iowa 23, 124 N.W. 775; United States Fidelity & Guaranty Co. v. Egg Shippers' Strawboard & Filler Co., 8 Cir., 1906, 148 F. 353; Summers v. Des Moines Ins. Co., 1901, 116 Iowa 593, 88 N. W. 326; Johnson v. Des Moines Life Association, 1898, 105 Iowa 273, 75 N.W. 101; Lewis v. Burlington Ins. Co., 1890, 80 Iowa 259, 45 N.W. 749; Lewis v. Burlington Ins. Co., 1887, 71 Iowa 97, 32 N.W. 190. The plaintiff contends, however, that the provisions which appear in the chapter on group insurance have a different legal effect. In the original Group Life Insurance Act of 1919 and in subsequent codes it was provided as follows:

"No policy of group insurance shall be issued or delivered in this state unless and until a copy of the form thereof has been filed with the commissioner of insurance and approved by him; nor shall such policy be so issued or delivered unless it contains in substance the following provisions:

"1. * * *

"2. A provision that the policy, the application of the employer and the individual applications, if any, of the employes insured, shall constitute the entire contract between the parties, and that all statements made by the employer or by the individual employes shall, in the absence of fraud, be deemed representations and not warranties, and that no such statement shall be used in defense to a claim under the policy, unless it is contained in a written application."

See Iowa Code 1931, § 8678(2). In the 1933 amendment, which added group health and accident insurance, the quoted provision was retained as to group life insurance and was copied as to group health and accident insurance with the addition at the end of the section of the words "attached thereto." See Iowa Code 1935, §§ 8684-e5(2), 8684-c6(1). Under that section, as it then existed it would seem that an insurer would be precluded from using defensively anything contained in an individual application for coverage under a group health and accident policy unless the individual application were attached to the master policy. The section remained the same until the 1947 amendment to the chapter. The amended section appears as Iowa Code 1950, § 509.3(1), I.C.A., set out supra. The plaintiff calls attention to the fact that in the amended section the provision as to stating what items constitute the entire contract has been dropped, and that the provision requiring statements to be used defensively to be in writing and attached to the master policy has also been deleted. The plaintiff further calls attention to the fact that the amended section requires the application of the "policyholder" (in the present case the Iowa State Bar Association) to be attached to the master policy, and that it provides that (italics supplied):

*"no statement made by any person insured shall be used in any contest unless a copy of the instrument containing the statement is or has been furnished to such person."*

The plaintiff contends that under the amended section defensive use by the insurance company of conditions of coverage or of statements of insured members is dependent only upon its furnishing a copy of the instrument containing the condition or statement to the member and not upon attaching such instrument to the master policy. The plaintiff points out that the defendant in this case was furnished a copy of the enrollment card signed by him containing the condition it relies on, when he was sent the certificate to which such card was attached. The plaintiff contends that it thereby complied with the provisions of the statute and that nothing further was required of it to enable it to rely on the condition in the enrollment card. The defendant contends that the provisions of §§ 515.94 and 515.95, supra, apply to the situation in the present case, and that under those sections the condition in the

enrollment card cannot be used defensively by the plaintiff because the card or a copy of it was not attached to the master policy. The defendant points out that §§ 515.94 and 515.95 have not expressly been made inapplicable to group health and accident policies, and that those sections have been held applicable to new types of insurance. See Tusant v. Grand Lodge A. O. U. W., and United States Fidelity & Guaranty Co. v. Egg Shippers' Strawboard & Filler Co., supra. However, Chapter 509, as amended, does seem to be complete in itself on the subject of group insurance, and § 509.3(1) seems to be fundamentally inconsistent with §§ 515.94 and 515.95, particularly in view of the change in § 509.3(1) from the former provision requiring statements to be attached to the master policy to the present provision requiring a copy of the statements to be furnished to the insured member. Since § 509.3(1) deals specifically with group health and accident insurance, and since it has been enacted in its present form more recently than §§ 515.94 and 515.95, § 509.3(1) must govern in the present case. It is believed that it would be an unreasonable construction of § 509.3(1) to hold, as apparently contended by the defendant, that an insurance company must attach thousands of individual enrollment cards to the master policy in order to rely defensively on statements or conditions set out on such cards. The defendant suggests that this could be avoided by placing the condition in the master policy. The plaintiff states that, while it could have included the condition as to coverage in the master policy, its failure to so do would not prevent it from including the condition in the contract of insurance in other ways available to it. The plaintiff states that putting the condition in the individual enrollment cards directly and immediately above the place where enrollees would sign the card was a better method of informing enrollees of the condition than having the condition set out in the single master policy kept at the office of the Iowa State Bar Association in Des Moines, Iowa. It is the view of the Court that the Iowa statutes as to insurance do not prevent the plaintiff from proving and relying on the condition as to "active full time duty" expressed in the enrollment card. However, the fact that the Iowa statutes do not so prevent the plaintiff from proving and relying on such condition does not, ipso facto, make the enrollment card a part of the insurance contract between the plaintiff and the defendant. Apart from statute (as in the present case) the matter of what is to be considered as constituting the insurance contract is a matter of intent. In the present case the parties are in controversy as to whether the plaintiff and the defendant intended the enrollment card to be a part of the insurance contract between them.

It is the contention of the defendant that the statement in Standard Provision No. 1 of the master policy that:

"This policy includes the endorsements and attached papers, if any, and contains the entire contract of insurance,"

is indicative of an intent on the part of the contracting parties to exclude the individual enrollment cards from the contract, because such cards had the status neither of endorsements nor of attached papers. The plaintiff, however, claims that Standard Provision No. 1 is inconsistent with Miscellaneous Provision No. 5, which states that:

"This policy, the application of the Association and the individual applications of the Insured Members constitute the entire contract between the parties."

The plaintiff contends that this latter provision indicates that the contracting parties meant to include the individual applications (enrollment cards) of the members in the contract of insurance. It is apparent that the two provisions are contradictory to one another on the subject of what constitutes the contract of insurance. The plaintiff calls attention to the fact that the "Standard Provisions" set out in the master policy are general provisions such as might appear in any contract of group insurance, but that the "Miscellaneous Provisions" are special provisions designed only to deal with the particular problems present in writing

the policy of group insurance on the Iowa State Bar Association. The plaintiff contends that, under these circumstances, the rule that the specific provision controls in event of irreconcilable conflict between a specific and a general provision in a contract should be applied. The rule contended for by the plaintiff is a familiar rule in the construction of contracts. See, e. g., Restatement, Contracts § 236(c); Patton, Iowa Annotations to the Restatement of the Law of Contracts, p. 379; 17 C.J.S., Contracts, § 313; 12 Am.Jur., Contracts, § 244. It is also to be noted that the language in Standard Provision No. 1 is not expressly required by any Iowa statute. It is the view of the Court that the position of the plaintiff is well taken, and that the statement in Miscellaneous Provision No. 5 prevails over the statement in Standard Provision No. 1.

■■■ As further supporting its contention that the enrollment card was intended by the parties to be part of the insurance contract, the plaintiff calls attention to the recitation on the front page of the master policy that:

"This policy is issued in consideration of the application of the Association and individual applications, if any, * * *."

It is the view of the Court that such statement also tends to support the contention of the plaintiff as to the intent of the parties.

■■■ The defendant contends that the "Incontestable Provision" in Part XI of the master policy, set out supra, is indicative of an intent on the part of the parties that no condition in the enrollment card or elsewhere should operate to exclude any eligible member of the Bar Association from coverage under the policy, and that its terms have the effect of barring the plaintiff from raising the condition in the enrollment card. The plaintiff, however, points out that the Incontestable Provision purported only to make policies of insured members:

"incontestable as to the time of origin of sickness which causes loss after the effective date of his or her certificate."

The plaintiff contends that this clause was intended by the parties only to become operative *after the insurance of an insured member became effective*. Thus, the plaintiff argues, the incontestable clause could not possibly have any effect in a dispute between the parties about a condition as to coverage which, if valid, would have prevented the insurance from ever becoming effective until that condition was met. In support of this contention the plaintiff cites the cases of Metropolitan Life Ins. Co. v. Conway, 1930, 252 N.Y. 449, 169 N.E. 642, and Sanders v. Jefferson Standard Life Ins. Co., 5 Cir., 1925, 10 F.2d 143. These cases hold that an incontestable clause does not prevent an insurance company from resisting a claim under a policy on the ground that such coverage was not assumed by the insurer under the policy. It would seem that the principle of those cases tends, by analogy, to support the contention of the plaintiff herein as to the effect of the incontestable clause. The plaintiff also points out that the incontestable clause in the master policy makes the insurance incontestable only as to "the time of origin of sickness which causes loss," and does not purport to deal with the condition as to coverage.

■■■ The defendant also contends that the provision in Part XII of the master policy, set out supra, that statements contained in the applications of eligible members "shall be considered as informative only," together with the provisions in Standard Provision No. 2, that statements of the applicant not included in the master policy shall not avoid the policy, and in Miscellaneous Provision No. 6 that statements of insured members must, to be used defensively, be contained in the written application, all are indicative of an intent on the part of the contracting parties that the statements in the enrollment card shall not be part of the insurance contract and cannot be effective to exclude the defendant from coverage. However, the plaintiff points out that the condition it relies on was not a "statement" made by the insured. The plaintiff also contends that the recitation of the condition on the enrollment card cannot be considered as "in-

formative only" within the meaning of Part XII, supra, for it was inserted by the company, and the company would not need to inform itself of the condition. It is the contention of the plaintiff that, whatever effect these provisions might have as to representations or warranties or other statements made by the Bar Association or by members of the group, such provisions have no legal effect on questions concerning the condition expressed in the enrollment card and are not indicative of an intent that the enrollment card not be part of the contract. Conditions in an insurance contract are very different from representations or warranties. See 45 C.J.S., Insurance, § 473(4). Conditions on coverage have the effect of excluding or excepting coverage unless and until they are complied with. See, e. g., Bradley v. New York Life Ins. Co., 8 Cir., 1921, 275 F. 657; Rogers v. Great-West Life Assur. Co., D.C.Minn.1942, 48 F.Supp. 86, affirmed, 8 Cir., 1943, 138 F.2d 474; Prosser, The Making of A Contract of Insurance in Minnesota (1933) 17 Minn. L.Rev. 567, 582–589. It would seem that the position of the plaintiff is well taken and that the provisions of the master policy as to statements of the insured are not relevant to this case.

As bearing on the question of the intent of the parties, the plaintiff also calls attention to the fact that the paragraph on the enrollment card which conditions effectiveness of the insurance on the applicant's being on active full time duty begins with the words "It is hereby understood and agreed." The plaintiff contends that when the defendant read and signed such card the minds of the parties met on the subject of that condition, and that the defendant's signing of such card also is indicative of an intent on the part of the parties that the enrollment card and the condition thereon be part of the insurance contract.

 The defendant seeks to invoke the familiar rule of construction that provisions in insurance contracts of doubtful or ambiguous meaning should be construed against the insurance company. The plaintiff denies that the rule is applicable in the present case because such rule should not be applied so as to contravene the intentions of the parties. From a reading of the entire master policy and the enrollment card, it would seem that the manifest intention of the parties was that the enrollment card and the condition stated thereon should be part of the contract of insurance between them. Thus the rule of construction contended for by the defendant is inapplicable. It is the view of the Court that the enrollment card issued by the plaintiff to the defendant, with the condition stated thereon, was part of the contract of insurance between them.

It should also be noted that in the application of the Iowa State Bar Association, set out supra, which application was attached to the master policy when it was delivered, it was stated under Paragraph 4, dealing with the number of members eligible, that:

"To be eligible for insurance hereunder, members must be on active full time duty on the date such insurance is to become effective."

The defendant contends that this statement is of no effect because it was not carried forward into the definition of eligibility stated on page 1 and in Part XII of the master policy. The defendant also contends that the quoted statement in the application is inconsistent with the provisions as to eligibility requirements in the master policy, and that where there is a conflict between the application and the master policy the master policy must govern, citing Goodwin v. Provident Savings Life Assur. Soc., 1896, 97 Iowa 226, 66 N.W. 157, 32 L.R.A. 473, and Moulor v. American Life Ins. Co., 1884, 111 U.S. 335, 4 S.Ct. 466, 28 L.Ed. 447. The plaintiff agrees that if the provisions are inconsistent the provisions in the policy are controlling. The plaintiff contends, however, that the above-quoted provision in the application is not inconsistent with the master policy. The conclusion heretofore noted that the enrollment card was a part of the insurance contract renders it unnecessary to consider whether the provision as to "active full time duty" in the Bar Association's application might not also be a condition which would suspend the effectiveness of the insurance as to a

given member until he complied with the condition.

The situation in the present case, then, amounts to this: The defendant was not on active full time duty on the effective date of the group policy. Under the terms of the contract, if an enrolled member was not on active full time duty on such date, the insurance under the group policy did not become effective as to him until he resumed active full time duty. Hence, it would appear that the plaintiff would prevail herein unless it has waived its defense based on the condition as to "active full time duty" or unless it is estopped to assert such condition or unless it has elected to affirm coverage of the defendant under the policy. The issues as to waiver, estoppel, and election will next be considered.

As heretofore noted, the defendant's office sent a check to the plaintiff in payment of the defendant's first semi-annual premium on September 30th, 1950. At that time the plaintiff had no knowledge that the defendant had been a bed patient in a hospital since September 25th, 1950. The plaintiff first became aware of the defendant's illness and hospitalization when it received Bert B. Burnquist's letter of November 24th, 1950, which made a full and correct disclosure of the facts relative to the defendant's illness and hospitalization. In the subsequent correspondence between representatives of the plaintiff and Bert B. Burnquist the plaintiff took the position that the defendant was not covered under the group policy because he was not on active full time duty on October 1st, 1950, and the defendant, through Bert B. Burnquist, took the position that he was covered under such policy. It is clear that the plaintiff knew that the defendant was claiming coverage and that the defendant knew that the plaintiff was denying coverage. With this background, the defendant calls attention to the fact that the plaintiff, after acquiring knowledge of the defendant's illness and hospitalization, retained the defendant's first semi-annual premium (which at the time the plaintiff first had notice of the defendant's illness and hospitalization was largely unearned), accepted and retained the defendant's semi-annual premium tendered on March 7th, 1951, sent a premium notice to the defendant while he was still in the hospital (in September 1951), and accepted and retained the semi-annual renewal premium which the defendant sent in following such premium notice. It is the contention of the defendant that the conduct of the plaintiff, in view of its knowledge of his situation and claims, constituted a waiver on its part of its defense based on the condition as to "active full time duty" or estopped it from relying on such condition. It is the contention of the plaintiff that there was no waiver or estoppel because the defendant was fully informed of its position (that he was not covered under the policy), and that it could not refuse to accept the premiums when tendered by the defendant because he had a right under the policy, by paying the premiums, to maintain his status as an enrolled member in the group. It is the contention of the plaintiff that the maintenance of such status was of value to the defendant because it would enable him to be covered by the group insurance as soon as he resumed active full time duty without offering proof of insurability. Otherwise, the plaintiff claims, he would have to offer evidence of insurability in order to obtain insurance coverage or else wait until the next period when Bar Association members would be insured without evidence of insurability, as provided in Part XII of the master policy, heretofore set out. Therefore, the plaintiff argues, its acceptance and retention of the premiums, was not a waiver of its defense based on the condition and did not estop it from relying on such condition, because by paying the premiums the defendant maintained his right to be covered automatically under the group policy as soon as he returned to active full time duty.

The terms "waiver," "estoppel," and "election," have not always been applied with precision by the courts and have often been used interchangeably as symbols of related concepts. In the introductory note to Chapter 14 of his book Cases and Materials on The Law of Insurance, (2d Ed. 1947), Professor Patter-

938

son defines and distinguishes the terms, as follows (p. 671):

"The term 'waiver' is used sometimes broadly to indicate *merely the legal consequence* that a particular defense by the insurer is not available because of some conduct of it or its agents, and sometimes more narrowly to mean 'an intentional relinquishment of a known right'. The term 'estoppel' always involves the notion of reliance by one party (insured) upon the conduct of the other (insurer), and varies in meaning with the kind of conduct of the latter, which may be either a representation of fact (estoppel by misrepresentation), a promise (promissory estoppel) or merely 'taking a position', a manifestation of election. * * * 'Election', a term sometimes synonymous with 'waiver', means a manifested choice by a person having the power to choose definitively one of two alternative legal relations and having knowledge of the facts which give him such power."

Professor Prosser, in his article, The Making of a Contract of Insurance in Minnesota (1933) 17 Minn.L.Rev. 567, 594–595, distinguishes waiver from estoppel as follows:

"Waiver is the intentional relinquishment of a known right; it is the expression of an intention not to insist upon what the law affords. It is consensual in its nature; the intention may be inferred from conduct, and the knowledge may be actual or constructive, but both knowledge and intent are essential elements. Estoppel, on the other hand, is not consensual in character. It is recognized, not to give effect to a presumed intention, but to defeat the inequitable intent of the party estopped. Strictly speaking, an estoppel in pais arises when one party makes, by word or act, a false representation of fact, to induce action, and the other party in good faith reasonably relies upon it to his detriment."

The term "waiver" is often used so as to include the concept of election. When the concept of waiver is limited to "the intentional relinquishment of a known right," however, the concept of election is clearly distinguishable from waiver, because election does not involve an intent to relinquish a right. An election arises where there is a choice in favor of one of two inconsistent rights, even though there is no intent to relinquish the other right. This is made clear in *Williston on Contracts* (Rev. ed. 1936) § 684, where it is stated:

"The law simply does not permit a party in the case supposed to exercise two alternative or inconsistent rights or remedies. Even though he expressly states that he intends to reserve a right, he will, nevertheless, lose it if he takes an inconsistent course."

In an article by John S. Ewart, entitled "Waiver" In Insurance Law (1928) 13 Iowa Law Review 129–144, the author contends that a great deal of unnecessary confusion has been created in the field of insurance law by inaccurate use of the words *void, forfeiture,* and *waiver*. It is his contention that it is incorrect to state that an insurance policy is rendered void upon breach of a condition stated therein and that the policy is thereupon forfeited unless the company waives the forfeiture. The author contends that it would be more accurate to consider the breach of the condition only to render the policy *voidable* at the election of the company—thereby giving the company a choice between terminating the policy because of the breach or continuing the policy in effect. He further contends that in the event of such a situation the onus should be on the company to give the insured notice within a reasonable time of its election to terminate the policy, and that if it does not do so then it should be considered as having elected to continue the policy in effect. In other words, he contends that silence on the part of an insurance company where it has knowledge of a breach of a condition by the insured constitutes, in itself, an election to affirm the policy and not to raise such breach in defense to a claim under the policy. The defendant in the present case, in accord with this line of thought, contends that the failure on the part of the plaintiff to repudiate the policy entirely as

to the defendant—knowing of the facts which brought the defendant within the terms of the "active full time duty" condition—without more, constituted an election on the part of the plaintiff to treat the policy as covering the defendant. It is not clear whether the Iowa Supreme Court would so hold, although the case of Glasscock v. Des Moines Ins. Co., 1904, 125 Iowa 170, 100 N.W. 503, would seem to lend some support to this position. *But cf.,* Keenan v. Missouri State Mutual Ins. Co., 1861, 12 Iowa 126. However, that question need not be passed upon in the present case because of the view which the Court takes of the legal effect, under the circumstances, of the plaintiff's accepting the defendant's premiums and sending him a premium notice. In the article by Ewart in the Iowa Law Review, supra, the author points out that an insurance company's acceptance of premiums, after becoming aware of facts which under a condition stated in the policy make the policy voidable, constitutes a manifestation of an election to continue the policy in effect. He also contends that a demand for payment of the premium should have a similar effect. The authorities would seem to support his conclusions as to the legal effect of accepting premiums with knowledge of a defense to the policy. In Williston on Contracts (Rev. ed. 1936) § 687 it is stated:

> "Similarly, in insurance law, the acceptance of a premium or assessment, liability for which exists only on the assumption that the policy is to continue in force, is an election not to terminate it because of a known breach of condition or defense."

See also, 29 Am.Jur., Insurance, §§ 857, 863. Although the Iowa cases vary in the terminology used it would seem that they support Professor Williston's above-quoted statement.

The Iowa Supreme Court, in several cases, has considered the effect of acceptance or retention of premiums by an insurance company after it has notice of a situation which would allow it to avoid liability on the policy. In Keenan v. Missouri State Mutual Ins. Co., 1861, 12 Iowa 126, it was held that if an insurance company had assessed and collected a premium after it had notice of a violation of the terms of an insurance policy it had waived the forfeiture. To the same effect, see Keenan v. Dubuque Mutual Fire Ins. Co., 1862, 13 Iowa 375; Viele v. Germania Insurance Company, 1868, 26 Iowa 9, 55; Mershon v. National Insurance Co., 1872, 34 Iowa 87. In Padrnos v. Century Fire Ins. Co., 1909, 142 Iowa 199, 119 N.W. 133, it was held that where, under the terms of the policy, a transfer of the insured property and an attempted assignment of the policy rendered the policy void, the insurance company was estopped to assert such invalidity by its retaining the "assignee's" premium note and cash payment thereon. In A. A. Cooper Wagon & Buggy Co. v. National Ben Franklin Ins. Co., 1920, 188 Iowa 425, 176 N.W. 309, an insurance company defended an action on a fire insurance policy by alleging breach by the insured of a provision against procuring additional insurance in companies unauthorized to do business in Iowa. The Court held that by issuing the policy knowing such facts, and by accepting and retaining the premiums, the company was estopped from relying defensively on such breach by the insured. In Neiman v. City of New York Ins. Co., 1927, 202 Iowa 1172, 211 N.W. 710, it was held that where an insurance company, with knowledge of a transfer of title of insured property, accepted payment of a portion of a premium and made demand for payment of the balance it had waived its right to insist on the invalidity of the policy because of such transfer. In Venz v. State Automobile Ins. Association, 1933, 217 Iowa 662, 251 N.W. 27, there was involved an insurance policy on automobiles which the owner used in a car rental business. Under the terms of the policy a premium of 20 cents was to be paid each time a car was rented if the trip was such as to incur a risk under the policy. At the close of each month, the insurance company and the owner computed the amount of premiums due for insured trips during that month. The policy in question excepted coverage as to drivers under 16 years of age. On one occasion the owner rented a car to a boy

who was 15 years of age. Under the terms of the policy the trip taken by that boy was not covered. The boy had an accident while driving the rented car. Afterward, with full knowledge of the driver's age and of the accident, the insurance company accepted the 20 cent premium tendered by the car owner for the boy's trip. A judgment in the amount of $9,000 was subsequently rendered against the owner of the car. The judgment having been returned unsatisfied, the injured person brought an action on the policy against the insurance company. It was held that by accepting and retaining the 20 cent premium the insurance company had waived its right to assert that the risk was not covered by the policy, and the company was held liable to the limit of its $5,000 policy. The Court stated, 251 N.W. at page 30:

"* * * the appellant insurance company, knowingly having collected and retained the premium from Wren, which it had no right to collect and retain except by virtue of the contract, it will be deemed to have affirmed the contract and to have assumed the liability thereof."

The Court further stated, 251 · N.W. at page 30:

"Certainly the appellant cannot be permitted to receive the benefit of the policy by accepting and retaining the premium, with knowledge of the facts, and yet be relieved of the liability under the contract."

Again, 251 N.W. at page 30, it was stated:

"The appellant company could avoid the policy and forego the premium, or it could waive the condition and accept the benefits of the policy in the way of the premium. The appellant company saw fit to waive the condition and accept the benefits of the policy by accepting the premium, and it cannot now, after accepting and retaining the benefits, repudiate its liability."

As to waiver of exceptions to coverage of persons over a certain age in health and accident policies by accepting and retaining premiums with knowledge of the age of the insured, see Lipe v. World Ins. Co., 1942, 142 Neb. 22, 5 N.W.2d 95; Boult v. Maryland Casualty Co., 5 Cir., 1940, 111 F.2d 257.

It is the contention of the defendant that the facts in the present case bring it within the rule of the foregoing cases, and that the plaintiff, under the circumstances, cannot now avoid liability on the policy because of the "active full time duty" condition. The defendant points out that in the present case there are no difficulties as to authority of the person acting—the Secretary of the Western Department of the plaintiff, in Chicago, Illinois, had knowledge in his official capacity of the facts of the defendant's illness and hospitalization as early as December, 1950, or January, 1951. Moreover, the defendant calls attention to the fact that C. S. Warner, Adjuster for the plaintiff for the Western Department, wrote the letter of October 8th, 1951 (set out *supra*) which directed the Max L. Holmes Agency to accept the renewal premium received from the defendant. It is the contention of the defendant that this letter is indicative of a deliberate choice on the part of the plaintiff to treat the policy as covering the defendant.

As heretofore noted, the plaintiff seeks to avoid the effect of its conduct with respect to the premiums by contending that the premiums were accepted by it only for the purpose of allowing the defendant to maintain his status as an enrolled member in the group, so that insurance coverage would be effective as to him when he resumed active full time duty without his offering evidence of insurability. The plaintiff contends that the defendant knew that the company was denying coverage under the policy and that by not requesting refund of his initial premium and by paying subsequent premiums, the defendant elected to make such payments not for coverage but for the privilege of maintaining his status as an enrolled member in the group. The principle contended for by the plaintiff is substantially this: that acceptance or retention of premiums after acquiring knowledge of facts which constitute a defense to one obligation under a policy does not operate as a waiver or work an estoppel as to that defense if there is an alternative obligation under the policy. Such principle

seems to be well established. See Annotation, Continued Acceptance of Insurance Premiums or Dues as Basis of Waiver of, or Estoppel to Assert, Misrepresentation or Breach as Affected by Alternative Obligation Which Survived Misrepresentation or Breach, 101 A.L.R. 1138–1144; 29 Am. Jur., Insurance, § 858. The case of Melton v. Royal Highlanders, 1922, 194 Iowa 352, 189 N.W. 787, would seem to be an application of this principle. In that case it was held that where an insured member of the organization was killed while engaged in an occupation prohibited under the edicts of the organization, that the organization had not waived its right to resist payment because of such violation by accepting dues after it had obtained knowledge that the insured was engaging in such occupation, because the insured was covered at all times other than when he was at work at that occupation. See also Beeman v. Farmers' Pioneer Mut. Ins. Ass'n, 1897, 104 Iowa 83, 73 N.W. 597, in which it was held that, where an assessment fire insurance policy provided that coverage should be avoided during delinquency on assessments, the company had not waived such provision by accepting a delinquent assessment payment from a member who sustained a fire loss while his insurance was suspended pursuant to such provision. The defendant contends, however, that there is nothing in the master policy in the present case which lends support to the contention of the plaintiff that premiums can be accepted and retained by the plaintiff not for coverage but merely to preserve his status as an enrolled member. The defendant contends that he was not aware of this uncommunicated reservation on the part of the company as to the purpose for which it accepted and retained his premiums. The defendant states that it was his intent in paying the premiums to pay for insurance coverage, and that such premiums were not "earned" by the plaintiff unless he was covered. The defendant contends that the principle relied on by the plaintiff is not applicable in the present case because here the plaintiff assumed no obligation under the policy in addition to coverage. He contends that the policy in question contains no express provision for suspending coverage while full premiums are paid merely for the privilege of becoming insured when one resumes active full time duty. The plaintiff makes reference to the enrollment card and to the Eligibility Requirements set forth on Page 1 and in Part XII of the master policy, supra, in support of its contentions on this matter. However, the defendant argues that there is nothing in any of those provisions which purports to inform members of the enrolled group that, if their insurance coverage is withheld under the "active full time duty" condition, they must pay full premiums in the meantime in order to be able to obtain insurance coverage without evidence of insurability when they return to active full time duty. It would seem that the policy provisions bear out the contentions of the defendant in this regard, because there is no express provision in the policy which seems to contemplate the situation which the plaintiff claims to have existed.

The plaintiff contends that if the enrolled member does not have to pay premiums in order to preserve his right to be insured without evidence of insurability when he resumes active full time duty, then the granting of that right by the company is without consideration. The defendant points out, however, that, under the terms of the policy, there is to be a "free enrollment period" every three years for members of the Bar Association, i. e., a period during which members of the Bar Association can enroll for insurance without offering evidence of insurability. See Part XII(b) of the master policy, supra. The defendant contends that it would be unreasonable to construe the contract to require the enrolled member to pay full premiums in order to preserve his right to be insured without evidence of insurability upon resuming active full time duty within this three year period, when, at the end of such period, he could become insured without evidence of insurability. The defendant also calls attention to the fact that, under the policy, the Iowa State Bar Association must pay a premium of $1 per year on the policy of each enrolled member. He contends that such payment is valuable consideration sufficient to preserve the right of one whose coverage is

withheld because of the "active full time duty" condition to become insured upon compliance with that condition. The plaintiff contends that the statement on Page 1 of the master policy that:

> "This policy is issued in consideration of * * * the payment of the initial premium and the further payment of renewal premium,"

refers to the premium paid by the individual member. The plaintiff argues that if such premium were paid there would be consideration for the member's privilege of becoming insured without evidence of insurability upon resuming active full time duty, but that if such premium were not paid there would be no consideration for such right. This argument assumes that the defendant had an enforceable right to preserve such status. Assuming that the policy gave him such right, the defendant contends that the above-quoted statement does not necessarily refer only to the individual premiums, but could also refer to the premiums paid by the Bar Association. It is the view of the Court that it is not necessary for it to determine the purpose of the $1 contribution made by the Bar Association. It would seem that if the full annual premium of a member would "buy" full insurance coverage under the policy, then payment of the full annual premium ought not to be necessary to maintain the far lesser status of being an enrolled member without coverage. It would seem that the obligation of the plaintiff to allow the defendant to become insured without offering evidence of insurability when he returned to active full time duty, if there be any such obligation under the policy, is not the sort of alternative obligation which would justify the plaintiff in accepting the benefit of the defendant's full premiums while denying him coverage, in the absence of a definite mutual understanding that the defendant was paying full premiums in order merely to have such right.

■■■ The plaintiff contends that the defendant was informed in the correspondence between the parties that his premiums were being accepted only to preserve his status. The defendant denies that he was so informed. The correspondence would seem to support the contention of the defendant in this regard. In the letter written December 18th, 1950, by William R. Prouty, Jr., to Bert B. Burnquist, it was stated:

> "According to the terms of the enrollment as soon as your son returns to active full time practice his insurance then becomes effective and under the Iowa State Bar policy if he should have a recurrence of this disability after his insurance becomes effective that recurrence would be covered in full by this policy."

The defendant points out that nothing was said about the necessity of the defendant's paying full premiums in order to make this come about. In the letter written January 2d, 1951, by H. K. Bollan to Bert B. Burnquist, it was stated:

> "We sincerely hope that your son may speedily recover his health and return to active full-time duty, whereupon his insurance, if retained as an original enrollee, will become effective."

The defendant argues that this statement did not say that the defendant had to pay full premiums in order to "be retained as an original enrollee," and that nothing contained in any of the other letters purported to so state.

It would seem that there was no agreement between the plaintiff and the defendant in the policy or elsewhere that the plaintiff could accept and retain the defendant's full premiums, while withholding coverage as to him because of the "active full time duty" condition, merely for the purpose of preserving a right on his part to become insured upon compliance with such condition. Thus the rule against waiver where there is an alternative obligation under the policy is not applicable in the present case.

■■■ Upon a consideration of all of the facts, it would seem that the plaintiff, by retaining the initial premium of the defendant and by accepting and retaining the two subsequent premiums tendered by him— all after deliberately considering whether or not to accept and retain them and with full knowledge of the facts—elected to treat the policy as covering the defendant.

Technically, under the facts in the present case, the conduct of the plaintiff could not be considered to work an estoppel, because there was no evidence of a representation or holding out by the plaintiff or of reliance by the defendant. Neither can the conduct of the plaintiff be considered to operate as a waiver, strictly speaking, because the plaintiff never manifested to the defendant that it intended to relinquish its right to assert the condition. However, the conclusion seems inescapable that its conduct did constitute an *election* to treat the policy as being in effect as to coverage of the defendant. As heretofore noted, an election does not depend on an intention to relinquish one right. An election is manifested by *affirming* one right which is inconsistent with another, even though there is no intention to relinquish the other. In the present case the plaintiff's affirming of its right to the premiums by its acceptance and retention of the defendant's premiums was fundamentally inconsistent with its denial of coverage because of the condition. The plaintiff may not have intended to relinquish its right to insist on the condition, but it cannot escape the legal effect of its actions in electing to affirm the coverage by accepting and retaining the premiums. Of course, the matter of terminology is not decisive in itself. In the Iowa cases reviewed *supra*, the Iowa Supreme Court has denominated what is here called "*election*" as either "*waiver*" or "*estoppel.*" In the Venz case, supra, for example, the Iowa Supreme Court held that the insurance company, by collecting and retaining the premium had "*waived*" its right to defend on the ground that coverage was excepted because of the age of the driver. The Court was not using "waiver" in its strict sense, because it was apparent that the insurance company there had not intentionally relinquished its right to assert such defense. The Court was using the term "waiver" synonymously with the concept of "election" as used in the present case. It would appear that essentially the Venz case and the present case are indistinguishable. In each case the insurance company deliberately chose to accept and retain premiums after acquiring knowledge of the insured's claim under the policy

and of a defense to such claim. The Iowa Supreme Court stated in the Venz case, 251 N.W. at page 30, that the company could not:

> "* * * be permitted to receive the benefit of the policy by accepting and retaining the premium, with knowledge of the facts, and yet be relieved of the liability under the contract."

So here, the plaintiff cannot, after accepting and retaining the defendant's full premiums with complete knowledge of facts which constituted a defense available to it, refuse to pay the defendant the benefits under the contract. The fact that the plaintiff mailed a premium notice to the defendant prior to his sending in the semi-annual renewal premium is further evidence of an election on the plaintiff's part to treat coverage under the policy as being in force.

█ The plaintiff contends that it could not refuse to accept the premiums tendered by the defendant because of the following provision on Page 1 of the master policy (Italics supplied):

> "Individual Renewals. The Company reserves the right to decline to *renew the insurance of any Insured Member* on the following grounds only:
>
> "a. Upon his failure to pay any premium when due; or
>
> "b. When the insured becomes seventy years of age; or
>
> "c. *When he retires or ceases to be actively engaged in the legal profession*; or
>
> "d. When he ceases to be an active member of the Association."

Based upon the premise that under the provisions of that paragraph it could not have refused to accept the premiums tendered to it by the defendant, the plaintiff argues that its acceptance and retention of them could not operate as a waiver or constitute an estoppel or an election. However, it is the view of the Court that the provision relied upon by the plaintiff relates to renewals of members as to whom the group policy was effective as to coverage, and would not prevent the plaintiff from rejecting premiums tendered by one who it claims

944

not to have been covered because of the "active full time duty" condition in the enrollment card. It is the view of the Court that it was optional with the plaintiff to accept or reject the premiums tendered to it by the defendant. Having accepted and retained them, the plaintiff thereby manifested its election to treat the group policy as covering the defendant, and it is bound by its election.

Judgment will be entered in accordance with this opinion.