157 So.2d 6

Kathleen N. Wickman WHITE

v.

MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY.

3 Div. 999.

Supreme Court of Alabama.

July 3, 1963.

Rehearing Denied Oct. 31, 1963.

Sam Rice Baker, M. R. Nachman, Jr., and Steiner, Crum & Baker, Montgomery, for appellee.

Rushton, Stakely & Johnston, Montgomery, for appellant.

HARWOOD, Justice.

This is an appeal from a judgment entered on a jury verdict in a declaratory judgment proceeding. The judgment found that Dr. John B. White, the husband of the appellant, Kathleen N. Wickman White (defendant in the court below) was not covered by an amendment to a group life insurance policy issued by the appellee, the Massachusetts Mutual Life Insurance Company, to Jackson Hospital and Clinic, Inc.

In its complaint below the insurance company alleged that it issued a policy of group life insurance on 19 December 1949 to the Jackson Hospital and Clinic. The policy covered all of the employees of said hospital who received specified annual earnings which determined the amount of life insurance as shown by the policy; that John B. White, M. D., the husband of the appellant, was employed by the said hospital on December 28, 1958, and was covered through the terms and conditions of said policy for the sum of $10,000; that the appellant was designated as beneficiary to receive the proceeds due under said policy in the event of the death of her husband.

The complaint further alleges that effective 19 December 1959, the said policy was amended to increase the amount of insurance on the life of Dr. White from $10,000 to $30,000, and that the said amendment provided:

"Provided that if an employee ·is not : actively at work on the effective date of this amendment, the changes . as herein provided shall not become effective as to such employee until the next following date on which he is actively at work on full time."

The complaint further averred' that Dr. White was not actively at work on the effective date of said amendment (19. December 1959) and that Dr. White was not actively on full time subsequent to 19 December 1959 and prior to his . death on 13 February 1960, and that the amendment therefore did not become effective so far as Dr. White was concerned; and that the appellee insurance company had admitted its liability to the appellant in the sum of $10,000, the amount due under the policy prior to its amendment.

Thereafter the appellant filed her plea and demanded a jury trial. In her plea the appellant denied that the amendment of 19 December 1959 increasing the benefits under the policy to $30,000 was not effective as to Dr. White; she denied that Dr. White was not actively at work on the effective date of the amendment; and denied that Dr. White was not actively at work on full time after 19 December 1959, and prior to his death on 13 February 1960.

Appellant joined in the prayer for declaratory judgment and prayed that the court render a judgment decreeing that the insurer was indebted to her for the increased benefits as provided by the amendment effective 19 December 1959.

At the conclusion of the testimony the court below gave to the jury, at the appellee's request, the general affirmative charge with hypothesis. The jury returned a verdict consonant with the court's instructions,

and judgment was entered pursuant to the verdict. Hence this appeal.

The evidence introduced in the proceedings below shows without contradiction that Dr. John B. White was employed by the Jackson Hospital and Clinic as a staff surgeon. In October 1959, he became ill and entered Jackson Hospital on 27 October 1959. After a few days he went to a hospital in Atlanta, Georgia, and there, after an exploratory operation, it was determined that he was afflicted with a cancer of the lungs, and that the condition was inoperable.

His physicians in Atlanta determined that he should undergo cobalt treatments. At first Dr. White was a patient in the hospital in Atlanta but later moved to a motel, and still later rented a small home near the hospital where he resided until a day or two before his death. All evidence shows that Dr. White was determined to recover; that he looked upon hospitalization as a surrender to his disease, and for this reason his physicians did not insist that he remain in the hospital.

The evidence shows, however, that Dr. White underwent cobalt treatments in Atlanta virtually continuously from 1 December through 31 December 1959.

As before noted, the policy sued on was amended on 19 December 1959, with the proviso already set forth. On 23 December 1959, Dr. White took a cobalt treatment in the early morning, and then flew to Montgomery. Dr. White went to his home and there he was picked up by the secretary and bookkeeper of his firm and driven to the Jackson Clinic. It was customary to have a Christmas party at the Clinic each year and this year, according to the secretary, Dr. White's friends were invited in addition to the office personnel because of Dr. White's illness.

Dr. White's visit to his office, and its purpose, we think is well illustrated by the testimony of Mrs. White who is also a physician and was a partner in the medical firm of Campbell, White and Wickman, Mrs. White being professionally known as Kathleen N. Wickman, M. D.

"A Well, after the delivery work itself there was a lot of repair work and checking the baby and talking to the family and so forth and I estimate I must have gotten downstairs about three o'clock.

"Q Did you find that they had a Christmas party in progress down there?

"A Yes, it was going on full swing when I got there.

"Q At that party, were there patients and friends of Dr. Jack White's?

"A Oh, yes. We had a real mixture. There were friends there, there were patients there, there were nurses there and an occasional doctor would come in and it was just a crowd of folks there.

"Q What, if anything, had been done to tell those patients that he would be there in that office on that day, the 23rd of December, 1959?

"A Well, this had been planned for some time and Josephine knew that he would be in and she spread the word around that he would be in the office on the 23rd.

"Q Had a rumor gotten out that his arm and shoulder had been removed?

"A Yes. That was the main reason that Jack planned to be back at that time. When he went to Atlanta he was complaining of pain in his arm and shoulder and the cobalt therapy helped that and he was feeling better and he had a large number of phone calls from patients and some of them called him and some of them wrote to him and they told him that they had heard that his arm had been removed, and he didn't want them to think that and he wanted to be in his office and he wanted some patients to come in and see him so that they could go out through the

country side and disprove this rumor and he wanted his patients to know that he was doing well and that he was improving and that he was being taken care of and as soon as he was able that was the most convenient time to come back and see these folks."

It appears that during the time Dr. White was at his office on 23 December 1959, he told Lester Holley that he would have his secretary write a letter to an insurance company in reference to the claim for accident insurance pertaining to an accidental injury Mr. Holley had suffered previously and for which Dr. White had treated him.

Jimmy Lee Crenshaw had been receiving weekly treatments from Dr. Campbell, Dr. White's partner, for a heart condition. He was quite friendly with Dr. White and had visited him in Atlanta. Dr. White listened to Crenshaw's heart with a stethoscope and gave him some pills to take.

Peacock Elijah had driven Crenshaw to town. He, too, was a close friend of Dr. White's, and Dr. White looked at an x-ray of Elijah's foot, which had been injured during the war. Dr. White had previously attempted to secure a disabled veteran's preference for Elijah in connection with a government job. He performed no treatment on the foot and told his nurse to give Elijah a flu shot since an epidemic was on at the time.

Douglas Goode, administrator of the hospital, came by and had Dr. White sign some Blue Cross claims in connection with surgical treatments prior to October 27, 1959, and also to discuss with Dr. White the question of office space.

The office records fail to show that any charges were entered by Dr. White in connection with any medical service he might have rendered on that day, nor had any appointments been set up for him.

In this connection the appellant introduced evidence to the effect that Dr. White was not careful in keeping his office records.

Dr. White never returned to his office again, though during the Christmas holidays he did go bird hunting once or twice. On 28 December 1959, he returned to Atlanta and resumed treatments for his malignancy. He remained in Atlanta from that time on until his death on 13 February 1960, with the exception of one or two short visits to Montgomery.

He did not go to his office on any of these visits, except that he came by his office once in his hunting clothes. He saw a couple from Wetumpka on that occasion, though the nature of this visit is not disclosed by the record.

The evidence further shows that after the onset of his illness on 27 October 1959, the salary of Dr. White's nurse was paid by the partnership; Dr. White received no further distributions from the partnership and nothing further was credited on the books to him. Prior to 27 October 1959, Dr. White's earnings from his practice had been substantial. While his office remained open, the rent for November and December had been paid in advance, and thereafter the hospital made no further charges for his office space.

The evidence further shows that continuously from 27 October 1959 to the date of his death, Dr. White applied for and received total disability benefits from two other insurance companies. In his applications for these benefits, Dr. White stated that he had been totally disabled continuously from 27 October 1959, as did his attending physician.

On 2 March 1960, an application for total disability payments from 26 January 1960 through 13 February 1960, was signed "Dr. John B. White, Mrs. John B. White." The appellant admitted that the signature "Mrs. John B. White" was written by her. It is apparent from the exhibit that both signatures are in the same handwriting.

The attending physician's statement accompanying the above application executed by Dr. W. A. Hopkins, who was Dr. White's physician in Atlanta, states that

Dr. White was continuously and totally disabled from October 27, 1959 to the date of his death.

In connection with the amendment of the group policy made on 19 December 1959, with the proviso that the amendment should not be effective as to any employee not actively at work on that date, but should be effective as to such employee the next following date on which he is actively at work on full time, the appellant argues that such proviso has been abrogated by the terms of a "certificate rider" issued in connection with the amendment.

This certificate rider has the following provision:

"If any employee is not actively at work on the effective date shown in this rider, said changes shall not become effective as to such employee until the next following day on which he is actively at work."

It should be noted, however, that this "certificate rider" provides:

"This rider should be attached to and made a part of the certificate for group insurance issued by the Massachusetts Mutual Life Insurance Company under the group insurance policies specified below."

A reference to the certificate for group insurance issued with the original policy shows that the insurance evidenced by the original certificate "is provided under and subject to all of the provisions of the group policy." The policy itself clearly provides in Section 1(c) as to the employees eligible for the insurance:

"Employees who are not actively at work on the date when they would otherwise become eligible, upon their return to full time active work."

We have already set forth the provisions of the amendment to the policy made on 19 December 1959, which is to the same effect.

While a certificate issued by the insurer to the employer to be furnished to the employee as evidence of his insurance benefits is not to be ignored in construing the contract, the terms of the master policy are to govern unless the terms of the certificate contradict those of the master policy on a material point to such an extent as to silence the inquiry. Page v. Prudential Insurance Company of America, 231 Ala. 405, 165 So. 388.

The present policy provides that the application of the employer, and the individual applications, if any, of the employees insured shall constitute the entire contract. The policy thus stipulates what instruments constitute the entire contract, and the certificate to be issued the employee is not an included instrument. Further, the certificate rider upon which the appellant relies provides that it is to be made a part of the certificate of group insurance issued under the policy. As aforestated, this original certificate specifies that it was subject to all of the provisions of the policy. The provisions of the policy are that Dr. White, if not actively at work on 19 December 1959 "should be eligible the next following date on which he is actively at work on full time." This provision of the policy must be deemed to govern Dr. White's eligibility.

As set forth in All States Life Ins. Co. v. Tillman, 226 Ala. 245, 146 So. 393:

"Thus this group policy defines what shall constitute the entire contract. It wholly omits the individual certificates to the employee as a part of the contract. While it is contemplated the employee shall have such certificate as evidence of his inclusion in the coverage of the group insurance, the certificate is issued to the employer, and the rights of the employee would not be affected, if it never reaches him. This is the logical construction of the contract, and the construction given like contracts in other jurisdictions. Seavers v. Metropolitan Life Ins. Co., 132

Misc. 719, 230 N.Y.S. 366; Hardie v. Metropolitan Life Ins. Co. (Mo. App.) 7 S.W. (2d) 746; Thull v. Equitable Life Assur. Soc., 40 Ohio App. 486, 178 N.E. 850; Note 63 A.L.R. 1035."

The evidence is uncontradicted that Dr. White was not at work on 19 December 1959. Thus his eligibility must be determined by whether he was actively at work on full time on 23 December 1959.

We also note that paragraph 8 of the complaint for the declaratory judgment, sets out the provisions of the amendment of 19 December 1959, which provides that the amendment shall not become effective as to any employee not actively at work on that date, and shall not become effective as to such absent employee until the next following date on which he is actively at work on full time.

In her plea to the complaint the appellant admits all of the allegations in paragraph 8 of the complaint, except the allegation that the policy was amended on 19 December 1959. The uncontradicted evidence shows that the policy was amended on 19 December 1959, and if such were not the fact then the appellant obviously would have no cause of action. The remaining part of the plea admits the other allegations of the complaint and the provisions of the amendment as to the effective date on which the policy was to be enforced as to employees not actively at work on 19 December 1959.

In Elsey v. Prudential Ins. Co. of America, 262 F.2d 432 (U.S. Court of App. 10 Cir.), "actively at work on full time" was construed to mean "actually on the job and performing the employee's customary work."

In Commercial Ins. Co. of Newark v. Burnquist, D.C., 105 F.Supp. 920, a lawyer was held not to be on active full time work where he was a bed patient in a hospital, although from time to time he conferred with his law partner and continued to draw a percentage of the firm's earnings, the court stating:

"It seems clear that a lawyer who is a bed patient in a hospital conferring only occasionally with the members of his firm and less frequently with clients cannot be regarded as being on 'active full time duty.' The situation is not changed by the fact that the firm of which he is a member continues to pay him his usual percentage of the firm earnings. The Court holds *as a matter of law* that the defendant was not on 'active full time duty' [on the key date]." (Emphasis supplied.)

Dr. White's specialty was surgery, though he also had a large general practice. According to Mr. Goode, the Administrator of Jackson's Hospital and Clinic, who was a witness for the appellant:

"Dr. White usually arrived at his office around ten o'clock in the morning and usually the first part of his morning was generally taken up with surgery and after that he saw his patients and would leave anywhere from 2:30 to 3:00 o'clock in the afternoon."

Dr. White had enjoyed a large practice before his illness. After 27 October 1959, no operations were scheduled for him in Jackson Hospital. His office records fail to show any appointments after that day, and no charges for any professional services rendered by Dr. White were entered. He did not participate in his firm's earnings after that date.

In Harlan v. Washington Nat. Ins. Co., 388 Pa. 88, 130 A.2d 140, the Supreme Court of Pennsylvania made the following observations as to the meaning of full time employment:

"It means being available for full employment; and full employment does not mean a hand at the helm throughout the entire voyage; it means standing by to take over when the exigencies

of the passage require the application of one's skill acquired over many journeys of the past."

From 27 October 1959, it was known that Dr. White was a desperately ill man. Despite heroic efforts the progress of his disease could not be halted, and death came some three and a half months later. Under no inference from any of the evidence could it be said that Dr. White was available for full employment.

In fact, the overwhelming inferences from the evidence are to the effect that Dr. White was physically unable to work even part time. Implicit in the term "full time" employment is the idea that the employee be available for his customary duties as the exigencies of his employment might demand. He was therefore not eligible for the increased benefits under the amendment, and the lower court did not err in giving to the jury the affirmative charge with hypothesis requested by the appellee.

Nor did the court err in sustaining the appellee's objections to the admission into evidence of the deposition of Dr. Edgar Grady.

This deposition discloses that Dr. Grady had been a friend of Dr. White for many years. He saw him non professionally in Atlanta several times. At the time he saw Dr. White he was able to get about and perform normal activities except he was fatigued easily. Shortly after Thanksgiving he offered him work in his laboratory, though no discussion as to salary, etc., ensued. He thought he could do this work. However, Dr. White never did work for him in the laboratory.

This evidence was not material or relevant to the issue of this case, that is, was Dr. White actively employed full time by the Jackson Hospital and Clinic in Montgomery.

Affirmed.

·LIVINGSTON, C. J., and SIMPSON and MERRILL, JJ., concur.